[No. S080550. Feb. 24, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
PHILIAN EUGENE LEE, Defendant and Appellant.

622

---

**COUNSEL**

Conrad Petermann, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly Wilkens and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**CHIN, J.**—Defendant Philian Eugene Lee was convicted of first degree murder with personal use of a firearm. (Pen. Code, §§ 187, subd. (a), 189, 12022.5, subd. (a).)[1] The jury found as a special circumstance that the murder was committed during the commission of an attempted rape. (§ 190.2, subd. (a)(17)(C).) After a penalty trial, the jury returned a verdict of death. The trial court denied defendant's automatic application to modify the verdict (§ 190.4, subd. (e)), and imposed the death sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

### I. THE FACTS

#### A. *Guilt Phase*

##### 1. *Prosecution case*

On the evening of February 21, 1996, 18-year-old Devin Bates was with three friends when he received a call from Jarrod Gordon, a 17-year-old friend from school. After the call, the four young men drove to Jarrod's house in a car belonging to one of Devin's friends.[2] At the time, Jarrod was unable

---

[1] All further undesignated statutory references are to the Penal Code.

[2] In order to simplify our discussion we refer to defendant's companions and family members by first name throughout this opinion.

to walk due to a recent gunshot wound to his back. He wore a plastic full-body brace on his torso, had braces on his legs, and used a wheelchair.

When the group of five left Jarrod's house, Devin drove Jarrod in Jarrod's car with the wheelchair in the trunk, and Devin's friends followed behind. At Jarrod's suggestion, they drove to defendant's house in Moreno Valley, arriving between 10:00 and 11:00 p.m. Jarrod described defendant as a good friend. Devin had not met defendant before, and defendant introduced himself to Devin as "Point Blank."

After about an hour, the six young men left defendant's house.[3] Devin drove Jarrod's car, with Jarrod in the front and defendant in the back. The others again followed in their car until that car was involved in an accident. After he stopped to confirm no one had been injured, Devin left his three friends to deal with the accident and drove, at Jarrod's direction, to the nearby home of a girl named "Mele."[4] Jarrod testified Mele had paged him earlier in the evening.

While waiting for Mele to come outside, Jarrod told defendant and Devin he had been sexually intimate with Mele two days earlier. He mentioned he wore two condoms because he had heard a rumor that she was infected with the virus that causes AIDS. Jarrod then handed out condoms. Devin took one, and defendant took one or more.

It was after midnight when Mele came outside wearing sweatpants, sneakers, and a Pendleton-style jacket. She greeted the young men, accepted an invitation to hang out with them, and sat behind the driver's seat. Devin had been acquainted with Mele since elementary school, and it appeared to Devin that defendant also knew her.

After they drove around for a while, defendant suggested going to a lookout off Pigeon Pass Road. While there, Jarrod fired defendant's handgun into the air several times and saw defendant reload it. They then continued driving until they reached a grocery store in Moreno Valley where Jarrod bought a large bottle of rum. Devin did not drink because he was driving, but the others all drank from the bottle.

---

[3] Evidence presented during the penalty phase established that defendant was age 18 at the time of the incidents described above.

[4] Mele's full name was Melemanunanilanililinokalani Kekaula. Her father testified that her Hawaiian first name means "pretty songbird in the heavenly skies."

With no specific destination in mind, they reached San Bernardino. When they turned to head back to Moreno Valley, Mele took over driving. From the backseat where he was seated, Devin could see Jarrod "leaning toward" Mele and could see the two kissing when the car was stopped. When they reached Moreno Valley, they stopped at a gas station. While Mele was in the restroom, Jarrod told the others he had been "finger-banging" her while they drove. Defendant responded, "Man, that's nothing. I also done that."

Once Mele returned, Mele and defendant discussed another lookout area off Cactus Avenue, and Mele and Devin took turns driving there. When they arrived, Devin parked near a water tower. By that time, Mele's speech was slurred. Mele, Jarrod, and defendant continued to drink. The four discussed the rumor Jarrod had mentioned. Mele denied having the virus that causes AIDS and said the rumor was started by jealous girls. Defendant fired his handgun once or twice into the air. Mele and either Jarrod or defendant vomited outside the car, so Devin moved it about 20 yards down the road. As time passed, Mele exhibited more signs of intoxication. According to Devin, she became "incoherent, out of it completely. Not passed out, but not aware of her surroundings." While outside the car, Mele fell and called to Devin for help. He helped her up and led her to the backseat, where she lay on her back with her legs and feet hanging out of the driver's side rear door.

Jarrod moved into the driver's seat, and Devin sat next to him. Devin then noticed defendant standing near Mele's legs, fondling her breasts while Mele was "if not completely out of it, very close to."[5] Defendant next removed Mele's shoes and pants and threw them into the front passenger area while, according to Jarrod, Mele was "[p]ushing [defendant] away." Jarrod added that defendant did not "stop taking off her clothes when Mele was pushing him away." Devin heard a package being opened and heard defendant say he was "about to get it, get some." Defendant said something about having a "gym hat" or "Jimmy hat" on, which Devin and Jarrod understood to mean a condom. After defendant unzipped his pants, lowered them, and got on top of Mele, he moved his hips up and down. Devin testified that, after about three minutes, Mele "snapped out of it and forced [defendant] off of her." According to Jarrod, while defendant was on top of Mele, "[s]he was like telling him to get off," saying "stuff like, 'get off,' 'no.' "

---

[5] The evidence regarding what occurred in the backseat of the car between defendant and Mele was conflicting. Devin's testimony differed in some respects from Jarrod's, and their trial testimony differed in some respects from what each had told detectives shortly after the events occurred. In light of the sufficiency of the evidence contentions that follow, we set forth the facts here in the light most favorable to the judgment. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 319–320 [1 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

Jarrod testified that, after Mele pushed defendant, defendant "didn't get right off," and Devin ultimately agreed that defendant did not get off of Mele "directly," but remained on top of her for "a while." According to Devin, while defendant was still on top of Mele, she said they were mistaking her for a " 'toss-up whore,' " and defendant said something like " 'you know what we came up on the hill for.' " Devin told a detective that Mele said "somethin' about, 'I'll give it away when I wanna give it away.' " Devin testified that while defendant was still on top of Mele, she seemed almost to be in "a fit of rage, as if she was disgusted by what was going on." While defendant stayed on top of her, Mele continued to both verbally and physically indicate she wanted him to get off of her. Once defendant did so, Mele sat up in the backseat, "primping herself" as if she were "a mess" and talking loudly while "[v]ery angry and upset." Devin testified that, based on what he saw and heard during the encounter between defendant and Mele at the Cactus Avenue lookout, he had "no doubt" that defendant had attempted to have sex with Mele.

Saying he was going to "straighten [Mele] out," defendant got out of the car, walked to the side where Mele was sitting, and pulled her by the arm. Mele resisted, but she was pulled from the car and then stumbled, falling to her knees while defendant held her by her forearms. Defendant pulled Mele by her arms to the rear of the car. Devin and Jarrod could see the two standing there and could hear them talking but could not hear what they were saying at first. Mele made some hand or head gestures, and defendant then raised his voice and said something like, " 'Is that it?,' " " 'Is that how it's gonna be?,' " or " 'It's like that, huh.' " Defendant then wrapped his left arm around Mele's neck and held her facing him in the crook of his arm, drew his handgun from his back pocket, put the gun against Mele's forehead, and fired. Mele fell motionless to the ground. Defendant then "straddled her face" with his feet on either side, held the gun about six inches from her face, and fired six or seven more times without pausing.

Defendant raced back to the car and got inside. When Devin asked why he had shot Mele, defendant simply said, "Drive." Jarrod drove to the first intersection, where Devin took over. Jarrod asked defendant if he was sure Mele was dead. He also asked, "So, is that why they call you Point Blank?" Defendant, who appeared calm, did not respond to either question. Instead, he started singing, "almost like verses of rap music, like making gestures towards what he had just done" or "giving himself praise." Defendant sang about how he " 'had to do what he had to do because he didn't get his nut off,' " which Devin took to mean defendant did not have an orgasm. Defendant also said, " 'They're never gonna really have to make a rap about

my name being Point Blank.' " He seemed "proud, almost gloating." Jarrod testified defendant sang, " 'I didn't want to shoot you, didn't want to kill you, bitch, but you wouldn't give me any pussy.' " According to Jarrod, defendant said he shot Mele "because she wouldn't have sex with him," "because she wouldn't give it up."[6]

As they drove from the lookout, defendant threw Mele's clothes out the window, and Jarrod threw out the rum, athough the bottle was one-third full. At defendant's insistence, Devin and Jarrod each swore "on [his] mother[]" that he would not tell anyone what had happened. Defendant said he would trade the gun for marijuana and that he wanted to pin the murder on someone else.

Devin arrived home at approximately 5:00 a.m. Crying and upset, he told his parents what had happened. Devin was on juvenile probation at the time. After Devin showered and changed clothes, he and his parents went to the probation office where Devin reported what he had witnessed. Devin then was taken to the Moreno Valley Police Department where he was interviewed at length. At some point that day, Devin showed detectives where Jarrod and Mele lived. With Devin's permission, the police searched his bedroom, where they collected the clothes he had worn the night before. A sealed Trojan condom was found in his pants pocket.

In the meantime, defendant had driven Jarrod home. Before they went to sleep, defendant told Jarrod he was certain Mele was dead because " '[i]f the first bullet didn't get her, the second one did, if the second one didn't get her, then the third one did.' " He said that, as he shot Mele, he saw "pieces of her face coming off." Jarrod's great-aunt woke the two at 7:00 a.m. and drove defendant home. Defendant removed his pants and went to sleep. On her own initiative, defendant's girlfriend washed the pants. She testified she and defendant never used condoms.

That morning, a jogger found Mele's body clad in a T-shirt, a Pendleton-style jacket, underpants, and socks. Six empty .22-caliber shell casings were found near her body. Another five empty casings were found about 30 yards away, and two puddles of what appeared to be vomit were seen near the five casings. A criminalist testified that, in his opinion, all of the casings had been ejected from the same .22-caliber Beretta semiautomatic handgun. No gun

---

[6] According to both Devin and Jarrod, defendant at some point also claimed he had had "some kind of sex" with Mele.

was found at the scene, and the murder weapon was never found. According to witnesses, defendant had kept a .22-caliber handgun in his room.

That evening, the police interviewed Jarrod and searched his car. They found latent fingerprints matching defendant's prints on the trunk lid, the passenger side rear panel, and the outside of the passenger side rear door frame.

Police searched defendant's home the following day while defendant was not there. In the dryer, they found defendant's pants and a sealed Trojan condom. Defendant turned himself in a few hours after the search.

The forensic pathologist who examined Mele's body observed seven separate bullet wounds to her forehead, cheeks, lips, and chin. The bullets had perforated her skull and jaw and had fractured several teeth. The forehead wound was a contact wound. Most of the others had been inflicted from a short distance away, probably within two feet. Three of the wounds were fatal; the rest were survivable but could have been fatal if left unattended; all could have been caused by a small-caliber handgun, such as a .22-caliber, fired at close range. The pathologist noted that Mele had two crescent-shaped bruises facing each other on her upper left arm, each about four centimeters in length and two centimeters in width. The pathologist believed they were caused by "a significant degree of force." There was a smaller bruise on Mele's lower left arm, possibly caused by someone grabbing and pulling her, and another bruise on her right knee. All of the bruises had been sustained while Mele was alive, at any time between right before her death and 48 hours before death. The pathologist observed no physical evidence of a sexual assault and no trauma to Mele's breast or genital areas. A blood sample was taken and evidence was gathered for a sexual assault kit.

### 2. Defense case

The toxicologist who examined the blood sample taken from Mele's body, and determined it contained 0.14 percent alcohol at the time of her death, testified one would need a blood-alcohol level of over 0.20 percent to be rendered unconscious or unable to be readily aroused.

The defense also presented evidence of the crimes of moral turpitude that Devin and Jarrod had committed. One of Jarrod's prior felonies involved sexual assault.

### B. *Penalty Phase*

#### 1. *Prosecution case*

The prosecution presented evidence of four incidents in which defendant engaged in violent conduct, three of which occurred while he was a juvenile.

In February 1992, defendant, then age 14, refused to obey a school resource officer's order to leave the Moreno Valley High School campus. Defendant struggled when the officer grabbed him by the arm. The officer wrestled defendant to the ground and handcuffed him with the assistance of two other school officials. During the struggle, defendant's arm hit an official in the eye.

In October 1992, defendant and another teenager stopped two younger boys who were riding bicycles. They demanded the boys get off their bicycles and then rode off on them. One of the younger boys saw a knife handle tucked in the waistband of defendant's companion.

In January 1993, at defendant's instigation, he and two younger boys robbed a pizza deliveryman. They ordered pizzas by telephone. When the pizzas arrived, the group repeatedly struck the deliveryman with sticks. They knocked the man to the ground, grabbed the pizzas, and ran off. The deliveryman was able to return to his workplace but collapsed once there. His injuries required medical treatment.

In July 1995, defendant was either the driver or passenger of a car that was driven rapidly into a yard where people were having a barbecue. The guests, including teenagers and young children, were forced to scatter to avoid being hit. The car ran into a fence and drove off. The trial court took judicial notice that defendant pleaded guilty to misdemeanor assault with a deadly weapon in January 1996 in connection with this incident.

The prosecution also presented evidence of the impact of Mele's death on her family. Family members described her loyalty to their family, her memorial service, what holidays were like without her, and what they missed about her.

#### 2. *Defense case*

The defense presented the following evidence through testimony from defendant's father, Edward, his older brother, Lenier, Lenier's girlfriend, defendant's girlfriend, a teacher, and mental health professionals.

Defendant's mother, Jimmie, drank alcohol and took prescription drugs, including valium, while pregnant with defendant.[7] Defendant was born in 1977 with the umbilical cord wrapped around his neck. The cord temporarily stopped the flow of oxygen to his brain. When defendant was a child, he suffered two serious head injuries, once when he fell from a moving car and once when another boy hit him in the head with a golf club. Defendant was a slow learner with behavior problems, and Edward spanked him in a futile attempt to curb his aggressive behavior.

Edward worked nights, both parents regularly drank alcohol, and Jimmie used drugs. The couple got into fights that defendant tried to stop by crying or jumping between them. Defendant's parents separated in 1985 and soon divorced. Jimmie had primary custody of their sons until 1987. In that year, she left the two boys in Edward's custody one day and did not return. They lived with their grandmother for over a year and then joined their father. By that time, Edward had moved to Moreno Valley and had remarried. Defendant resented the new wife's rules, and Edward would "whoop" him when he broke them. Every week Edward took the boys to see Jimmie. By that time, she had been diagnosed with diabetes and, as a result, eventually lost both of her legs.

When defendant was age 14, a psychiatrist diagnosed him with attention deficit disorder (ADD), conduct disorder, and learning disabilities. The psychiatrist testified that ADD can be caused by fetal distress caused by an inability to breathe during delivery, as well as by head injuries or prenatal exposure to alcohol and drugs. She prescribed a stimulant that initially calmed defendant but then made him feel jumpy. She ordered him to continue the medication, but her records reflect no further visits from him.

During the 1992–1993 school year, defendant was placed in a special education program for students facing expulsion. He performed at more than two years below his grade level, but he cooperated with school personnel, and if he took his medication he could complete his assignments.

In May 1993, following an arrest, defendant was placed in a residential treatment program. While there, defendant was referred to a psychiatrist who concluded he displayed symptoms of ADD and hyperactivity. Defendant responded well to the prescribed medication, showed leadership skills, and

---

[7] Defendant's mother collapsed in the courtroom on the first day of the evidentiary portion of the trial and died four days later. The court declared a mistrial and empanelled a new jury.

stayed in the program for nine months. A social worker recommended an emancipation program because he felt Jimmie and Edward lacked the necessary parental skills to deal with defendant. Defendant and Edward decided against it, and defendant lived with Edward again. Defendant stopped taking the medication in January 1994.

After leaving the program, defendant began drinking alcohol and using marijuana. Edward "whooped" him, but defendant did not change his behavior. During a fight in 1994, defendant slapped Edward's face and then ran away. He did not return, but instead lived on the streets for a number of months.

When defendant returned home, he lived with Edward, Lenier, and Lenier's girlfriend. Defendant lovingly cared for his brother's son, and he loves his own son, who was born in June 1996. Lenier and his girlfriend testified defendant had matured since his arrest. Lenier said defendant had gained strength and wisdom, and he helped Lenier deal with Jimmie's death. Edward said he would be devastated if defendant were sentenced to death.

Dr. Cecil Whiting, an expert in clinical psychology, administered neuropsychological tests to defendant. He concluded defendant suffers from brain damage in three separate areas; that such damage can cause problems with learning, sequential processing, following instructions, and controlling anger; and that alcohol consumption exacerbates the effects of the damage. He noted defendant's brain damage could have been caused by head injuries and by prenatal drug or alcohol exposure. Dr. Whiting opined that conduct disorder was not a proper diagnosis because defendant's behavior problems and inability to learn from experience resulted from brain damage, not choice.

## II. Discussion

### A. Guilt Phase Claims

#### 1. Sufficiency of the Evidence

Defendant contends the evidence was insufficient to support his first degree murder conviction on either a premeditation theory or a felony-murder theory based on attempted forcible rape. He also claims the evidence was insufficient to support the special circumstance finding. He asserts that affirming the

judgment under such circumstances would violate his rights to due process and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution. We conclude these claims fail.[8]

The standard of appellate review for determining the sufficiency of the evidence is settled. On appeal, " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701 [94 Cal.Rptr.3d 699, 208 P.3d 634].) In conducting such a review, we " 'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*Ibid.*; see also *Jackson v. Virginia, supra*, 443 U.S. at pp. 319–320.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1].) These same principles apply to review of the sufficiency of the evidence to support a special circumstance finding. (*Id.* at p. 396; *People v. Ochoa* (1998) 19 Cal.4th 353, 413–414 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

■ The information charged the special circumstance of murder during a forcible rape or attempted forcible rape. The special circumstance was tried

---

[8] In this claim and most others on appeal, defendant contends the asserted error or misconduct he raises infringed various of his state and federal constitutional rights to a fair and reliable trial. What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], applies in the present case: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

solely on the theory of attempted forcible rape.[9] In 1996, forcible rape was defined, as it is today, as "an act of sexual intercourse *accomplished with a person not the spouse of the perpetrator* . . . [¶] . . . [¶] . . . [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).) "An attempt to commit rape has two elements: the specific intent to commit rape and a direct but ineffectual act done toward its commission." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1130 [40 Cal.Rptr.3d 118, 129 P.3d 321].) Intent to commit forcible rape requires (1) the intent to commit the act of sexual intercourse; (2) against the will of the victim (*ibid.*); (3) by any of the means described in section 261, subdivision (a)(2). (See *People v. DePriest* (2007) 42 Cal.4th 1, 48 [63 Cal.Rptr.3d 896, 163 P.3d 896].) "The act must be a direct movement beyond preparation that would have accomplished the crime of rape if not frustrated by extraneous circumstances." (*People v. Guerra, supra,* 37 Cal.4th at p. 1130.)

Here, the prosecution presented evidence that defendant approached Mele and began fondling her breasts while she was nearly "completely out of it" from alcohol consumption. She was on her back with her legs hanging out the rear door of Jarrod's vehicle when defendant stood at her legs and took off her shoes and pants. As defendant removed her clothes, Mele was "[p]ushing him away," but he continued taking off her clothes.

Defendant unzipped his pants, put on a condom, and said he was about to "get some." With his pants lowered, he straddled Mele and moved his hips up and down with his chest and "frontal area" touching Mele's chest and vaginal area. Defendant's left hand was moving "by his area where his penis [was]" and where Mele's "vagina would be at." After about three minutes, Mele "snapped out of it and forced [defendant] off of her" by pushing him. As she pushed, she angrily asked, " 'Do you think I'm a toss-up whore or something?' " Mele "verbally protest[ed] him being on top of her," "[a]lmost [in] a fit of rage, as if she was disgusted by what was going on." Defendant responded by saying, " '[Y]ou know what we came up on the hill for.' " While Mele was "telling [defendant] to get off" and saying " 'no,' " she continued to "physically respond . . . to try to get him off of her." Defendant was six feet two inches tall and weighed 270 pounds; Mele was five feet three inches tall and weighed 152 pounds.

The jury heard evidence from both Devin and Jarrod that, as Mele was pushing defendant away, he "didn't get right off," or get off "directly," that he

---

[9] At the close of the prosecution's case-in-chief, the prosecutor moved to amend the information to strike the reference to subdivision (a)(2) of section 261, in order to permit argument and instruction on the theory of attempted rape of an intoxicated person under subdivision (a)(3) of that section. The trial court denied the motion.

stayed on Mele for "a while." Devin had "no doubt" that defendant "was attempting to have sex with Mele."

After Mele was able to push defendant off of her, she appeared angry. She talked loudly as she "primp[ed] herself . . . as if she . . . wanted to have a better appearance." Devin turned on the dome light "to grab control of the situation," but defendant turned it off, saying he was going to "straighten [Mele] out." Defendant got out of the car, went to Mele's side, and pulled her arms. She resisted but was forced out of the car and then fell to her knees. Near the rear of the car defendant and Mele exchanged words Devin could not hear, with Mele gesturing with her hands and head, until defendant raised his voice and said something like, " 'Is that how it's gonna be?' " He then shot Mele in the face seven times.

As they drove away, Jarrod heard defendant say he had shot Mele "because she wouldn't have sex with him," "because she wouldn't give it up." Defendant sang "verses of rap music, like making gestures towards what he had just done," and "giving himself praise." He sang about how "he had to do what he done because he didn't get his nut off." He also sang, " 'I didn't want to shoot you, didn't want to kill you, bitch, but you wouldn't give me any pussy.' "

Evidence presented by the pathologist who examined Mele's body revealed that "a significant amount of force" would have been required to produce the crescent-shaped bruises on her upper arm and that those bruises could have been caused by a 270-pound man lying on top of Mele, supporting himself by holding her arms and exerting "a strong grasp and some additional weight."

■ The above evidence, and the facts that may reasonably be deduced from that evidence, support the jury's determinations that defendant intended to have sexual intercourse with Mele against her will[10] by means of force, that he engaged in a direct but ineffectual act aimed at raping Mele, and that he murdered her during the commission of an attempted forcible rape. The circumstance that Mele's underpants were on her body when found, and that no semen, other fluid, or genital trauma was found on her body, do not undermine this conclusion. (See *People v. Guerra, supra,* 37 Cal.4th at

---

[10] The jury correctly was instructed that "against one's will" means "without the consent of the alleged victim." (See *People v. Giardino* (2000) 82 Cal.App.4th 454, 460 [98 Cal.Rptr.2d 315]; *People v. Cicero* (1984) 157 Cal.App.3d 465, 480 [204 Cal.Rptr. 582].) The trial court then defined consent for the jury, pursuant to CALJIC No. 1.23.1 as "positive cooperation in an act or attitude as an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." CALJIC No. 1.23.1 is based on the statutory language in section 261.6. In part II.A.2., *post,* we reject defendant's contention that the trial court's instructions on consent were inadequate.

pp. 1130–1131 [physical evidence of a sexual assault is not a prerequisite to finding intent to rape].) Defendant reargues the evidence but fails to overcome the presumption favoring the jury's findings of fact. Viewing the evidence in the light most favorable to the prosecution and presuming in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence, we conclude there was sufficient evidence from which the jury could have concluded that defendant forcibly attempted to rape Mele and killed her because she was resisting his attempt to have sexual intercourse with her.[11] Accordingly, defendant's attack on the sufficiency of the evidence to support the felony-murder theory of first degree murder and the attempted-rape special circumstance fails.

Because we find substantial evidence supports the conclusion that Mele did not passively acquiesce in defendant's attempt to accomplish sexual intercourse and that he ignored her expressed unwillingness to engage in sexual intercourse with him, we need not address defendant's argument that, in amending the rape statute in 1982 to define consent as "positive cooperation in act or attitude pursuant to an exercise of free will" (§ 261.6), the Legislature intended that "mere passivity or assent on the part of the 'victim' was not excluded from the meaning of 'consent' as long as it was not the product of force, violence, duress, menace, or fear." For the same reason, we need not address defendant's claim that, within the meaning of section 261.6, "passive acquiescence alone does not equate with 'without the person's consent' or 'against a person's will.' " (Capitalization omitted.)

It is of no consequence that Devin's testimony differed in some respects from Jarrod's, or that the testimony of each differed to a certain extent from what he had told police, or that Devin was impeached on a minor matter with his preliminary examination testimony.[12] It was for the jury to decide whether these witnesses were credible, either in whole or in part. (See *People v. Maury, supra,* 30 Cal.4th at p. 403.) Nor is it significant that Jarrod was impeached with his statement to Detective Thompson that he did not see Mele's clothes come off because he "wasn't . . . paying attention." Jarrod admitted during cross-examination that he lied to police on some matters because he was in shock and just said whatever came to his mind. Moreover, because Devin testified that Jarrod helped defendant take Mele's clothes off, the jury

---

[11] Defendant does not argue that, assuming there was sufficient evidence of attempted rape, the evidence was insufficient to establish that the murder was committed "while [he] was engaged in . . . the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit," a rape with the meaning of the felony-murder special circumstance. (§ 190.2, subd. (a)(17); see *People v. Green* (1980) 27 Cal.3d 1, 60–61 [164 Cal.Rptr. 1, 609 P.2d 468].)

[12] The parties stipulated that, at the preliminary examination held several months after the murder, Devin had testified he could not see whether defendant had his zipper or his pants down while on top of Mele.

reasonably could have concluded Jarrod lied to police about what happened when the clothes came off to minimize his culpability in the events that ensued.

We next address defendant's claim that the evidence was insufficient to establish that he premeditated Mele's killing.

■ In the context of first degree murder, " 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" (*Ibid.*) "In [*People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942]], we 'identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing.' [Citation.] However, these factors are not exclusive, nor are they invariably determinative. [Citation.] ' "*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]" ' [Citation.]" (*People v. Combs* (2004) 34 Cal.4th 821, 850 [22 Cal.Rptr.3d 61, 101 P.3d 1007].) Here, the evidence supports each of the factors identified above.

First, defendant brought a loaded handgun with him on the night Mele was killed, indicating he had considered the possibility of a violent encounter. (*People v. Steele* (2002) 27 Cal.4th 1230, 1250 [120 Cal.Rptr.2d 432, 47 P.3d 225] [evidence defendant carried the fatal knife into the victim's home makes it " 'reasonable to infer that he considered the possibility of homicide from the outset' "].) After Jarrod fired a few shots from the gun at the first lookout, defendant reloaded the gun, supporting an inference that he had brought extra ammunition as well.

Second, the sequence of events, including defendant's pulling Mele from the car and shooting her after his frustrated sexual encounter, along with his statements that he killed her "because he didn't get his nut off" and because "she wouldn't give it up," was more than sufficient for the jury to find that defendant killed Mele because she refused to have sex with him. In addition, defendant's nonresponse to Jarrod's question "So, is that why they call you Point Blank?" and his rap verse " 'They're never gonna really have to make a rap about my name being Point Blank,' " support the conclusion that he killed Mele in a particular manner to live up to his nickname.

Third, the manner of killing was calm and exacting, supporting a conclusion that it was the result of preexisting thought and reflection rather than an unconsidered rash impulse. After Mele refused to have sex with him, defendant announced his intention to "straighten her out," forcibly removed her from the vehicle, and pulled her to the rear of the car. A brief conversation ensued, ending in defendant saying something like " 'It's like that, huh.' " Defendant then restrained Mele with his left arm, pulled his gun from his pocket, held it against her forehead, and fired once. When Mele fell to the ground, defendant straddled her and fired six more shots with the gun inches from her face. On the way home, defendant appeared "calm and collect[ed]." The jury could have concluded defendant's statement about his intent to "straighten [Mele] out," together with the multiple close-range shots to her face and head, indicated a premeditated and deliberate intent to kill. (*People v. Welch* (1999) 20 Cal.4th 701, 759 [85 Cal.Rptr.2d 203, 976 P.2d 754] [evidence defendant "straddled [the victim's] body after he had shot her once and shot her again" supported finding of premeditated and deliberate murder]; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [119 Cal.Rptr.2d 859, 46 P.3d 335] [firing at a vital area at close range supports finding of premeditation and deliberation]; *People v. Mayfield, supra*, 14 Cal.4th at p. 767 [shooting victim in the face supports inference of preexisting intent to kill].) Defendant's later statement to Jarrod, that " '[i]f the first bullet didn't get her, the second one did, if the second one didn't get her, then the third one did,' " supports the reasonable inference that defendant deliberately fired multiple shots because he "did not want merely to wound [Mele]; he wanted to make certain [she] died." (*People v. Bolin* (1998) 18 Cal.4th 297, 332 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

We conclude there was sufficient evidence from which the jury could have found defendant guilty of first degree murder on a premeditation and deliberation theory.

### 2. *Adequacy of Instructions Defining Consent for Attempted Rape*

Defendant contends the trial court's instructions improperly allowed the jury to find that he committed an attempted forcible rape even if it concluded Mele passively acquiesced in his sexual advances and that he "neither knew nor could reasonably be expected to know (from his own conduct or hers) that she did not want to have sex." He claims the trial court had a duty to instruct on its own motion that passive or unexpressed assent can be consent, that "positive cooperation in an act or attitude as an exercise of free will" does not require any physical or verbal expression of cooperation, and that the alleged victim must express her lack of consent in a manner such that a reasonable person would perceive she did not consent. Defendant argues the

failure to so instruct prejudiced him because his jury reasonably could have concluded that Mele initially passively acquiesced in his sexual advances and that he stopped trying to have sex with her as soon as she "snapped out of it" and pushed him off of her. He asserts the instructions improperly reduced the prosecution's burden of proof and denied him due process of law, a fair trial, the right to present a defense, a trial free from improper lessening of the prosecution's burden of proof, and a reliable and nonarbitrary determination of guilt, death eligibility, and penalty in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 1, 7, 15, 16 and 17 of the California Constitution.

We conclude defendant forfeited this claim by failing to object to the trial court's consent instruction or to request any modification or amplification of it at trial. A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel (*People v. Kelly* (1992) 1 Cal.4th 495, 535 [3 Cal.Rptr.2d 677, 822 P.2d 385]), and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal (*People v. Rundle* (2008) 43 Cal.4th 76, 151 [74 Cal.Rptr.3d 454, 180 P.3d 224]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 [91 Cal.Rptr.3d 874]). Here, with only minor exceptions, the challenged portion of CALJIC No. 1.23.1, which defines consent, tracks the language of section 261.6. Section 261.6 provides in pertinent part: "In prosecutions under Section 261 . . . in which consent is at issue, 'consent' shall be defined to mean positive cooperation in act or attitude pursuant to an exercise of free will." CALJIC No. 1.23.1, as given in this case, informed the jury that "consent means positive cooperation in an act or attitude as an exercise of free will." (See CALJIC No. 1.23.1 (6th ed. 1996).)[13] As given, CALJIC No. 1.23.1 correctly expressed the law. If defendant believed the instruction on consent required elaboration or clarification, he was obliged to request such elaboration or clarification in the trial court. (*People v. Rundle, supra,* 43 Cal.4th at p. 151; *People v. Hart* (1999) 20 Cal.4th 546, 622 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

Were we to address the merits of defendant's contention regarding the trial court's alleged failure to give clarifying instructions on consent, we would find that the jury instructions on consent were adequate in this case.

The jury was instructed as follows on the law of attempt, the crime of forcible rape, and the intent required for attempted rape: "An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done towards its commission. [¶] In determining whether such an act was done, it is necessary to distinguish

---

[13] Defendant does not argue the consent instruction given was erroneous on the basis of the minor differences between it and the corresponding statutory language.

between mere preparation on the one hand, [and] the actual doing of the criminal deed on the other. Mere preparation which may consist of planning the offense or devising, obtaining, or arranging the means for its commission is not sufficient to constitute an attempt. However, acts of a person who intend[s] to commit a crime will constitute an attempt where those acts clearly indicate a certain unambiguous intent to commit that specific crime. These acts must be an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original design. [¶] Rape is defined as follows: [¶] Every person who engages in an act of sexual intercourse with another person who's not the spouse of the perpetrator accomplished against that person's will by means of force, violence, duress or fear of immediate and unlawful bodily injury to that person is guilty of rape. [¶] Any sexual penetration, however slight, constitutes engaging in an act of sexual intercourse. Proof of ejaculation is not required. [¶] 'Against the person's will' means without the consent of the alleged victim. [¶] 'Force' means that amount of physical force required in the circumstances to overcome the victim's resistance. [¶] 'Duress' means a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which she would not have otherwise performed or acquiesce in an act [to] which she otherwise would not have submitted. The total circumstances, including the age of the alleged victim and her relationship to the defendant are factors to consider in apprising the existence of duress. [¶] The fear of immediate and unlawful bodily injury must be actual and reasonable under the circumstances. [¶] In order to prove the offense of attempted rape, each of the following elements must be proved: 1. A direct but ineffectual act was committed by the defendant toward the commission of rape of the alleged victim; 2. At the time of the act, the defendant had the specific intent to rape the alleged victim[.] [¶] [I]n order to prove defendant had the specific intent to rape, each of the following elements must be proved: 1. The defendant had the specific intent to engage in an act of sexual intercourse with the alleged victim; 2. The defendant had the specific intent to engage in an act of sexual intercourse against the will of the victim; and 3. The defendant had the specific intent to accomplish the act of sexual intercourse by means of force, violence, duress, menace or fear of immediate or unlawful bodily injury."

Pursuant to CALJIC No. 1.23.1, the jury next was instructed that consent in the context of rape means "positive cooperation in an act or attitude as an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." Based on CALJIC No. 10.65, the jury also was given the following modified *Mayberry*[14] instruction regarding the reasonable and good faith belief in consent as a

[14] *People v. Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337].

defense to attempted rape: "In the crime of attempted rape, criminal intent must exist at the time of the commission of the attempted rape. There's no criminal intent if the defendant had a reasonable and good faith belief that the other person voluntarily consented to engage in sexual intercourse. Therefore, a reasonable and good faith belief that there is voluntary consent is a defense to such a charge. [¶] However, a belief that is based on ambiguous conduct by an alleged victim that is the product of force, violence, duress or fear of immediate and unlawful bodily injury on the person or another is not a reasonable and good faith belief. [¶] If after a consideration of all of the evidence you have a reasonable doubt that the defendant had the criminal intent at the time of the attempted act of sexual intercourse, you must find the special circumstance not true."

These instructions were sufficient to apprise the jury of the relevant principles of law on the issues of intent and consent in the present case. The defense to the attempted rape charge was based on defendant's mental state. Under these standard instructions, which tracked the statutory language on consent and mental state, defendant's jury could consider all the circumstances in the case in determining whether defendant intended to accomplish sexual intercourse without Mele's consent. The instructions permitted the jury to consider defendant's argument that the law does not require "that before a man can start to make some kind of a sexual advance toward a woman that she has to say yes." The instructions similarly permitted the jury to consider defendant's argument that he got the wrong impression about whether Mele was willing to have sex with him, and his related argument that there was "a difference between a man who maybe hasn't been told yes but starts making some sexual advance and is told no and makes a choice to stop, [and] the man who doesn't care about consent or no consent and does intend to use force or violence." Reviewing the instructions as a whole, as we must (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 220 [79 Cal.Rptr.3d 125, 186 P.3d 496]), we find no "reasonable likelihood that the instruction [on consent] caused the jury to misconstrue or misapply the law" (*People v. Thornton* (2007) 41 Cal.4th 391, 436 [61 Cal.Rptr.3d 461, 161 P.3d 3]). Accordingly, we conclude the trial court did not have a sua sponte duty to further instruct that "positive cooperation in act or attitude" includes passive acquiescence or assent, or to elaborate that the jury could not find a forcible rape if Mele merely was passive and defendant did not know and had no reason to know she did not consent.

Having concluded the instructions on consent and mental state were adequate, and having rejected defendant's claims to the contrary, we do not reach the question whether an instruction that consent may be proved by evidence of an alleged rape victim's passive acquiescence would be consistent with the intent of the Legislature as expressed in section 261.6. We likewise need not address defendant's claim that, *if* section 261.6 excludes

passive acquiescence from the definition of consent, retroactive application of that definition to him constitutes an unforeseeable judicial enlargement of a criminal statute in violation of his rights to notice and an opportunity to defend the charges against him.

For the same reason, we need not reach defendant's claim that construing section 261.6 to exclude passive assent from the meaning of consent removes the requirement of a mens rea, or culpable mental state, from the crime of forcible rape, thereby violating due process of law by " ' "offend[ing] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." ' " (*McMillan v. Pennsylvania* (1986) 477 U.S. 79, 85 [91 L.Ed.2d 67, 106 S.Ct. 2411].) We add that, here, the jury was instructed that to find an attempted forcible rape it must find defendant intended to use force, violence, duress, or fear to overcome Mele's will (*People v. Gonzalez* (1995) 33 Cal.App.4th 1440, 1443–1444 [39 Cal.Rptr.2d 778]),[15] and, additionally, that a good faith and reasonable belief in lack of consent is a defense to attempted rape; this ensured defendant would not be found guilty of that crime unless the jury concluded he acted with a culpable mental state (*People v. Williams* (1992) 4 Cal.4th 354, 360 [14 Cal.Rptr.2d 441, 841 P.2d 961]; *People v. Mayberry, supra*, 15 Cal.3d at pp. 154–155; see also *People v. Gonzalez, supra*, 33 Cal.App.4th at pp. 1443–1444). Furthermore, as noted above, the evidence was more than sufficient to establish that defendant ignored Mele's expressed unwillingness to engage in sexual intercourse.

■ Defendant finally contends section 261.6 and CALJIC No. 1.23.1 violate the due process clause of the Fourteenth Amendment by creating a mandatory presumption that an alleged rape victim has not consented unless she expressly communicates her consent, and by relieving the prosecution of the burden of proving nonconsent in cases where the victim is passive. (See *Carella v. California* (1989) 491 U.S. 263, 265 [105 L.Ed.2d 218, 109 S.Ct. 2419]; *Francis v. Franklin* (1985) 471 U.S. 307, 313–314 [85 L.Ed.2d 344, 105 S.Ct. 1965].) This claim lacks merit because CALJIC No. 1.23.1 does not tell a jury that it must presume lack of consent if the alleged victim has not actively expressed consent. The instruction simply explains what consent means in the context of forcible rape, without unconstitutionally shifting the burden of proving consent to defendant. (*People v. Gonzalez, supra*, 33 Cal.App.4th at p. 1443.) The jury was instructed that defendant was presumed innocent until the People proved him guilty beyond a reasonable doubt; that the People had the burden of proving beyond a reasonable doubt the truth of

---

[15] The question for a jury considering the charge of forcible rape is "whether defendant used force to accomplish intercourse with [the victim] against her will, not whether the force he used overcame [her] physical strength or ability to resist him." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1028 [16 Cal.Rptr.3d 891, 94 P.3d 1089].)

the special circumstance of murder during an attempted rape; that the prosecution had to prove defendant "had the specific intent to engage in an act of sexual intercourse against the will of the alleged victim"; and that " 'against that person's will' means without the consent of the alleged victim." The instructions as a whole ensured the jury understood that the prosecution at all times bore the burden of proving each element of the charged offense and the special circumstance allegation, including, in the context of attempted rape, that defendant intended to have sex with Mele against her will and without her consent.

### 3. *Evidence of Defendant's Nickname*

Defendant's nickname was "Point Blank." He contends the trial court prejudicially erred by admitting evidence of his nickname. He argues, as he did in the trial court, that the evidence was irrelevant, impermissible character evidence of a "propensity to kill" in a particular manner and that the evidence had no probative value on the issue of identity. Alternatively, assuming his nickname had some probative value, defendant contends its prejudicial effect outweighed its probative value. He claims admission of his nickname violated his federal and state constitutional rights to "a fair trial, due process, [the] right to present a defense, a trial free from improper lessening of the prosecution's burden of proof, and a reliable and nonarbitrary determination of guilt, death eligibility, and penalty." For the reasons stated below, we conclude the trial court did not err by admitting defendant's nickname into evidence.

In the trial court defendant moved to exclude any evidence related to his gang membership, including his nickname. The prosecutor conceded there was no evidence that Mele's killing was gang related and agreed not to present evidence that defendant claimed membership in a gang. The prosecutor then argued, and the trial court agreed, that evidence of the nickname was relevant and admissible to prove defendant was the person to whom Devin was introduced hours before Mele was killed and to prove defendant's intent when he shot Mele. Pursuant to Evidence Code section 352, the court specifically "engaged in the weighing process" and found the proffered evidence's "probative value does exceed the prejudicial effect." It then stated that it expected the evidence to be limited to Devin's testimony that defendant introduced himself as "Point Blank," and that, after the murder, defendant did not answer when asked, "[I]s that why they call you Point Blank?"

"Evidence is relevant if it tends ' "logically, naturally and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Williams* (2008) 43 Cal.4th 584, 633 [75 Cal.Rptr.3d 691,

181 P.3d 1035]; see Evid. Code, § 210.) Even if relevant, evidence may be excluded in the trial court's discretion "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Rulings regarding relevancy and Evidence Code section 352 are reviewed under an abuse of discretion standard. (*People v. Brown* (2003) 31 Cal.4th 518, 550–551 [3 Cal.Rptr.3d 145, 73 P.3d 1137]; *People v. Gurule* (2002) 28 Cal.4th 557, 654–655 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

Here, while evidence of defendant's nickname was relevant to the issue of identity within the meaning of Evidence Code section 210, we agree with defendant that evidence of his nickname was cumulative of other evidence of identity and therefore had minimal probative value.

However, we conclude evidence of defendant's nickname was relevant and extremely probative with regard to the intent with which defendant shot Mele and whether the killing was premeditated and deliberate. The prosecution's theory was that defendant shot Mele the way he did, with seven shots to her face at close range, to live up to his nickname. In that regard, in her closing argument, the prosecutor reminded the jury that, immediately after the murder, defendant did not respond when Jarrod asked, "So, is that why they call you Point Blank?"[16] The prosecutor also reminded the jury that defendant sang a gloating rap song about the shooting and said, " 'They're never gonna really have to make a rap about my name being Point Blank.' " The next words of the prosecutor's argument to the jury were, "Does that show his express intent to kill? Absolutely. Absolutely."

Both defendant's adoptive admission that the manner in which he killed Mele was why he was called Point Blank, and his statement about the lack of a need to make up a rap song about his name being Point Blank, were highly probative to the mental state issues in this case. Reference to defendant's nickname, including the fact that he had introduced himself to Devin as "Point Blank" hours before he killed Mele, was necessary for the jury to understand the significance of defendant's statements after he shot Mele and their tendency to support the prosecution's theory that defendant intended to kill Mele in a particular way to prove he deserved his nickname. (See *People v. Brown, supra*, 31 Cal.4th at p. 551 [reference to defendant's nickname necessary to render understandable the testimony of a witness].)

---

[16] Evidence of Jarrod's question was admissible as an adoptive admission because jurors could conclude defendant heard and understood the question and, by his silence, adopted it as his own statement. (Evid. Code, § 1221; *People v. Davis* (2005) 36 Cal.4th 510, 535 [31 Cal.Rptr.3d 96, 115 P.3d 417].) We note that defendant's trial counsel acknowledged that, had defendant said, "Now you know why they call me Point Blank," evidence of that hypothetical statement would have been relevant.

Defendant next contends that, even if evidence of his nickname had some probative value, it should have been excluded under Evidence Code section 352. Specifically, he claims evidence of his nickname was unduly prejudicial because it suggested gang origins and prior criminal activity. We are not persuaded that defendant's nickname alone, without any evidence of gang membership, had a tendency to suggest he belonged to a gang when he shot Mele. However, assuming the nickname did imply either gang membership or prior criminal activity, the trial court did not abuse its discretion in admitting the nickname. The trial court carefully scrutinized the proffered evidence and concluded its prejudicial effect did not outweigh its probative value. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [16 Cal.Rptr.3d 880, 94 P.3d 1080] [evidence of gang membership is admissible to prove specific intent, means of applying force, or other issues pertinent to guilt of the charged crime].) We conclude the trial court did not abuse its discretion by finding the risk that the jury would improperly infer criminal disposition from defendant's nickname did not substantially outweigh the fact that evidence of defendant's nickname was highly probative because it uniquely tended to prove defendant had a specific reason for shooting Mele multiple times at very close range. We note that, in order to minimize the prejudicial impact of the evidence, the prosecutor avoided any reference to the subject of gangs throughout the trial by reminding the court to instruct witnesses not to mention defendant's gang affiliation,[17] and, at defendant's request, the jury was instructed not to consider the evidence of defendant's nickname "to prove that defendant is a person of bad character, has a disposition to commit crimes, or has ever acted in a manner consistent with this nickname."

Defendant next contends he is entitled to relief because the limiting instruction read to the jury was hopelessly confusing and internally contradictory. We disagree.

The challenged instruction read as follows: "Evidence has been introduced for the purpose of showing that the defendant had a nickname. This evidence, if believed, was introduced for a limited purpose and may only be considered by you for that purpose. The limited purpose for which this evidence was introduced was to prove that (1) the defendant was the person introduced to Devin Bates on February 21st, 1996, and (2) the defendant intended to kill Mele Kekaula. [¶] You are not to consider this evidence for any other purpose. You are not permitted to consider this evidence as proof that defendant killed, raped or attempted to rape Ms. Kekaula. Further, this

---

[17] The only direct reference to gangs at trial was a deputy sheriff's testimony that he was assigned to a gang unit when he contacted Jarrod, searched defendant's house, and arrested defendant. The jury was instructed that the evidence the deputy was a member of a gang unit "may not be considered by you nor may you draw an inference therefrom, that the defendant or the crime charged here is gang related in any way. In determining the guilt of the defendant in this case, you are to disregard this evidence entirely."

evidence may not be considered by you to prove that defendant is a person of bad character, has a disposition to commit crimes, or has ever acted in a manner consistent with this nickname. No evidence has been presented that on any prior occasion defendant acted in a manner referenced by the nickname. [¶] For the limited purpose for which you may consider this evidence, you must weigh it in the same manner you weigh all other evidence in the case."

The defense drafted the above instruction and requested it be given, even though the trial court commented that instructing the jury not to use the evidence to prove character or propensity might "undo any value" from a limiting instruction. Because defendant made a "conscious and deliberate tactical choice" (*People v. Wader* (1993) 5 Cal.4th 610, 658 [20 Cal.Rptr.2d 788, 854 P.2d 80]) to request the challenged instruction, any error was invited. (*People v. Thornton, supra*, 41 Cal.4th at p. 436.) In any event, the instruction correctly told the jurors they could not use the nickname as proof that defendant killed or attempted to rape Mele, or as proof that defendant was a person of bad character.

Defendant next argues the prosecutor exacerbated the prejudicial effect of the evidence by repeatedly referring to the nickname and linking it to the manner of the killing, rendering his trial fundamentally unfair in violation of his federal constitutional right to due process, but we find no "gratuitous use of, or reference to, the nickname." (*People v. Brown, supra*, 31 Cal.4th at p. 551.) Far from "permeat[ing]" the trial, as defendant argues, any references to the nickname that went beyond the trial court's ruling on the motion in limine were either minimal, inadvertent, objected to and stricken, or elicited by the defense. Devin twice used the nickname in response to questions, despite apparently having been warned by the prosecutor not to do so. The prosecutor twice used the name when examining witnesses, but, after a defense objection, she agreed the reference was improper and promised to tread "very carefully on this issue." The trial court sustained defendant's objection to the prosecutor's questioning of a witness regarding whether defendant had a hat with "Point Blank" on it and admonished the jury not to consider any such evidence. Other testimony about the name was elicited by the defense through the cross-examination of Detective Fernandez regarding his interview with Devin after the murder.[18] We are convinced the nonsanctioned instances in which defendant's nickname was mentioned "were brief, mild and factual and could not have been prejudicial." (*People v. Brown, supra*, 31 Cal.4th at p. 551.)

---

[18] At the time of the interview, Devin did not know defendant's true name.

Defendant next complains that the prosecutor improperly mentioned his nickname during her guilt phase arguments in reference to his self-identification and his statements after the killing and that, in her penalty phase summation, she improperly argued that, by his actions, "[defendant] discloses to you the essence of who he is. He introduces you to the man you have come to understand during the course of this trial. He introduces you to the man that was introduced to Devin on February twenty-first. He introduced you to Point Blank." To the extent defendant claims the prosecutor's argument constituted misconduct, his claim is forfeited because he failed to object or request a curative admonition in the trial court, and a timely objection and request for admonition would have cured any resulting harm. (*People v. Combs, supra*, 34 Cal.4th at p. 854.)

Finally, even were we to conclude either that the trial court erred by admitting evidence of defendant's nickname or that the prosecutor's use of it during argument constituted misconduct, such error was harmless on the facts of this case. Given the powerful evidence that defendant shot Mele seven times in the face at close range, watched pieces of her face come off while he was firing the gun, and commented that if the first bullet did not kill Mele, the second or third surely did, we are satisfied that the jury's verdict finding defendant guilty of first degree murder did not rest on evidence of his nickname. Further, defendant's nickname bore no sexual connotation and did not suggest that defendant intended to rape Mele or that he had any propensity to rape women. Defendant points to no use of the nickname during the penalty phase apart from the above-mentioned single reference during the prosecutor's lengthy closing argument. The significance of defendant's nickname pales in comparison with the brutal and highly aggravated manner of the killing. Accordingly, we conclude there is neither a reasonable probability of a guilt phase result more favorable to defendant absent any error nor a reasonable likelihood that any error affected the penalty verdict. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *People v. Brown* (1988) 46 Cal.3d 432, 447–448 [250 Cal.Rptr. 604, 758 P.2d 1135].) Likewise, any error in admitting evidence of defendant's nickname or in the prosecutor's argument was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]) as to guilt, the special circumstance finding, and the penalty imposed.

> 4. *Jury Instructions Related to Proof Beyond a Reasonable Doubt*

Defendant contends that 11 standard CALJIC instructions individually and collectively violated his right, under *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 90 S.Ct. 1068], not to be convicted of a crime on a standard less than proof beyond a reasonable doubt. He acknowledges we previously

have rejected these precise contentions, but requests that we reconsider our position as to each instruction. We decline to do so and summarily reaffirm our prior decisions upholding the constitutionality of the following instructions: CALJIC Nos. 2.01, 2.02, 2.21.1, 2.21.2, 2.22, 8.20, 8.83 and 8.83.1 (*People v. Nakahara* (2003) 30 Cal.4th 705, 713–715 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Maury, supra,* 30 Cal.4th at pp. 428–429); CALJIC Nos. 1.00 and 2.51 (*People v. Guerra, supra,* 37 Cal.4th at p. 1139; *People v. Snow* (2003) 30 Cal.4th 43, 97–98 [132 Cal.Rptr.2d 271, 65 P.3d 749]); and CALJIC No. 2.27 (*People v. Montiel* (1993) 5 Cal.4th 877, 941 [21 Cal.Rptr.2d 705, 855 P.2d 1277]).

### 5. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed prejudicial misconduct during her closing argument. We conclude defendant's objections to the prosecutor's closing argument lack merit.

While arguing that Mele did not consent to sex with defendant, and that defendant could not reasonably have believed that she did consent, the prosecutor told the jury, "She says no, and he's still on top of her, still attempting to get what he wants when he wants it from her because she's not a woman, she's not a young woman to him. She's an ends to a means [*sic*]." The prosecutor then argued, "What was Jarrod Gordon and Devin Bates' reaction when the defendant takes off Mele['s] pants and gets on top of her and *she starts to scream and struggle?* No badges of merit for either one of them at all." (Italics added.) When defense counsel objected that "[t]here's no evidence that anybody is screaming, or there's any kind of violent struggle as being described by counsel," the trial court responded, "Well, there's evidence that her voice was raised. Overruled on that point. The struggle is open to interpretation. The jury can recall the testimony."

Defendant contends the italicized portion of the prosecutor's argument was an "egregious exaggeration" of the evidence that amounted to misconduct. He further contends the trial court abused its discretion by refusing to correct the statement and by placing its imprimatur on the prosecutor's characterization of the evidence.

 The prosecution is given wide latitude during closing argument to vigorously argue its case and to comment fairly on the evidence, including by drawing reasonable inferences from it. (*People v. Gamache* (2010) 48 Cal.4th 347, 371 [106 Cal.Rptr.3d 771, 227 P.3d 342]; *People v. Harris* (2005) 37 Cal.4th 310, 345 [33 Cal.Rptr.3d 509, 118 P.3d 545].) Here, Devin and Jarrod testified that, when Mele pushed defendant off her, he did not get right off and that Mele was protesting loudly. Devin further testified that, while

defendant was on top of Mele, she said, " 'Do you think I'm a toss-up whore or something?' " while appearing to be angry and disgusted, "[a]lmost [in] a fit of rage." The prosecutor's challenged remark was a fair comment on the evidence and the inferences to be drawn from it. At worst, the prosecutor's characterization of Mele's response was "hyperbole" that fell "within the scope of permissible argument." (*People v. Navarette* (2003) 30 Cal.4th 458, 519 [133 Cal.Rptr.2d 89, 66 P.3d 1182].)

Because there was no misconduct, the trial court properly overruled defendant's objection, and its instruction to the jury to "recall the testimony" properly reaffirmed that the jurors should draw their own conclusions based solely on the evidence.[19] Contrary to defendant's argument, the trial court did not violate section 1044 by breaching its duty to "control all proceedings during the trial, and to limit . . . the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (*Ibid.*)

### 6. *Cumulative Effect*

Defendant argues the cumulative effect of the errors during the guilt phase so infected the trial with unfairness as to make the resulting conviction and special circumstance findings a denial of due process, requiring reversal of the guilt and penalty judgment. We have found no guilt phase error, and we reject defendant's argument on that basis.

### B. *Penalty Phase Claims*

### 1. *Admission of Evidence of Juvenile Misconduct*

■ Section 190.3, factor (b) provides that, in determining whether to sentence the defendant to death or life imprisonment without possibility of parole, the jury may consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Defendant contends the use of violent acts committed when he was a minor, and particularly those committed when he was 15 years old or younger, as aggravating evidence pursuant to section 190.3, factor (b), violated his rights under the Eighth and Fourteenth Amendments to the federal Constitution to a reliable, nonarbitrary sentencing decision, to a sentence proportionate to his culpability, and to due process of law.

---

[19] The jury's request for a read-back of the testimony of Devin, Jarrod, and Detective Fernandez regarding what occurred after Mele fell down outside the car suggests that, consistent with the trial court's instructions, the jurors properly decided for themselves what the evidence actually showed.

Among the acts of violent conduct admitted against defendant over his objection were four incidents that occurred while he was a juvenile: the 1992 incident at Moreno Valley High School when, during the course of violently resisting arrest, defendant hit a school official in the face; the 1992 robbery of bicycles from two young boys; the 1993 assault and robbery of a pizza deliveryman; and the 1994 violent confrontation with defendant's father, Edward Lee, during which defendant hit or slapped Edward in the face. Testimony about the latter incident was first elicited by the defense in its direct examination of Edward (see, *ante*, at p. 631), after the trial court denied defendant's motion to exclude evidence of the incident.

■ We have long held that evidence of violent juvenile misconduct that would have been a crime if committed by an adult is admissible under section 190.3, factor (b). (See, e.g., *People v. Lewis* (2001) 26 Cal.4th 334, 378 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *People v. Avena* (1996) 13 Cal.4th 394, 426 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People v. Lucky* (1988) 45 Cal.3d 259, 295 [247 Cal.Rptr. 1, 753 P.2d 1052].) We also have repeatedly held that the admission of such evidence passes constitutional muster. (See, e.g., *People v. Raley* (1992) 2 Cal.4th 870, 909 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People v. Cox* (1991) 53 Cal.3d 618, 689–690 [280 Cal.Rptr. 692, 809 P.2d 351].) Nonetheless, defendant argues admission of the evidence was unconstitutional in light of the high court's decision in *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183], holding that the Eighth and Fourteenth Amendments prohibit execution of individuals who were under 18 years of age at the time of their capital crimes. Defendant's reliance on *Roper* is misplaced. We recently have rejected defendant's argument by explaining that *Roper* "says nothing about the propriety of permitting a capital jury, trying an adult, to consider evidence of violent offenses committed when the defendant was a juvenile." (*People v. Bramit* (2009) 46 Cal.4th 1221, 1239 [96 Cal.Rptr.3d 574, 210 P.3d 1171]; accord, *People v. Taylor* (2010) 48 Cal.4th 574, 653–654 [108 Cal.Rptr.3d 87, 229 P.3d 12].)

## 2. *Evidence of Misdemeanor Guilty Plea*

During its penalty phase case-in-chief, the prosecution introduced evidence that in 1995, when defendant was age 18, he either drove or rode as a passenger in a car that was driven rapidly into a yard where a family was having a barbecue, forcing the guests, including teenagers and young children, to scatter to avoid being hit. Three witnesses, Ronald Gaither, Walter Fuller, and Joseph Scruggs, testified about the incident, but they were unable to identify defendant as having been in the offending car.

To establish defendant's involvement in the incident, the trial court agreed, over defendant's hearsay objection, to take judicial notice that in 1996

defendant pled guilty to a misdemeanor offense of assault with a deadly weapon on Scruggs. The court instructed the jury that it was going to take judicial notice of a misdemeanor case involving defendant. It explained that "what judicial notice is, is basically the Court recognizing events that took place in one of its other cases. And in this particular case, on January 10, 1996, [defendant] entered a plea of guilty to a charge of violating Penal Code Section 245 Subdivision (a) Subsection (1), a misdemeanor. The victim being Joseph Scruggs. [¶] Now, by taking judicial notice of this fact, the Court is in effect admitting this into evidence, but it's admitted for a very limited purpose. And you're instructed that that limited purpose is simply as it relates to the identity of the individual who may have been involved in the incident involving the car at the barbecue that you heard testimony about the other day. It is offered for no other purpose . . . . [¶] It is not, and I emphasize 'not' to be considered by you as a factor in aggravation that you may wish to consider in determining the appropriate penalty. It again is offered for the limited purpose of assisting you in determining the identity of the individual involved in that incident."

As he did in the trial court, defendant contends the trial court erred by taking judicial notice of his guilty plea because at the time of the capital offense, misdemeanor convictions were inadmissible hearsay when used to establish the conduct underlying the conviction. (*People v. Wheeler* (1992) 4 Cal.4th 284, 300 [14 Cal.Rptr.2d 418, 841 P.2d 938] ["evidence of a misdemeanor *conviction*, whether documentary or testimonial, is inadmissible hearsay when offered" to show that a witness committed misconduct bearing on credibility]; accord, *People v. Santos* (1994) 30 Cal.App.4th 169, 177–179 [35 Cal.Rptr.2d 719]; but see *People v. Ray* (1996) 13 Cal.4th 313, 369 [52 Cal.Rptr.2d 296, 914 P.2d 846] (conc. opn. of George, C. J., joined by Baxter, Werdegar, Lucas and Arabian, JJ.) ["the prosecution may rely upon a prior *conviction* of a crime involving the use or threat of force or violence to establish the presence of criminal activity involving the use or threat of force or violence for purposes of section 190.3, factor (b)"].) It was not until several months after the capital offense that the Legislature enacted section 452.5 of the Evidence Code, which allows the admission of records of a criminal conviction to prove "the commission, attempted commission, or solicitation of a criminal offense." (Evid. Code, § 452.5, subd. (b); see Stats. 1996, ch. 642, § 3, pp. 3620–3621; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1460–1462 [119 Cal.Rptr.2d 272].) Defendant argues the error violated his federal constitutional right to due process of law and was not harmless beyond a reasonable doubt.

The trial court properly took judicial notice that defendant *had pled guilty* to a misdemeanor offense. That guilty plea fell within the exception to the hearsay rule for admissions of a party (Evid. Code, § 1220) and was not inadmissible hearsay when offered to prove defendant's involvement in the

barbecue incident. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1322 [18 Cal.Rptr.2d 796, 850 P.2d 1] ["the guilty pleas of Cummings" were "admissible against Cummings as a declaration against his own penal interest, or as a confession or admission"]; *People v. Hayes* (1990) 52 Cal.3d 577, 632–633 [276 Cal.Rptr. 874, 802 P.2d 376] [evidence of defendant's juvenile court admission to commission of voluntary manslaughter admissible under § 190.3, factor (b)]; see also *Lake v. Reed* (1997) 16 Cal.4th 448, 461 [65 Cal.Rptr.2d 860, 940 P.2d 311].) Defendant's reliance on *Wheeler* is misplaced, as the trial court took judicial notice of defendant's guilty plea rather than of a conviction.[20]

Defendant argues the guilty plea showed only that he had acquiesced in a resolution of his criminal liability rather than taking the risk of going to trial, and points out that the plea said nothing about the identity of the car's driver. These arguments go to the weight of the evidence, not its admissibility. We conclude there was no error.

3. *Challenges to the Death Penalty Statute and Instructions*

Defendant raises several challenges to California's death penalty statute and penalty phase jury instructions based on various provisions of the federal Constitution. We reaffirm the decisions that have rejected those claims, and decline to reconsider them, as follows:

The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments. (*People v. Whisenhunt, supra*, 44 Cal.4th at p. 227; *People v. Moon* (2005) 37 Cal.4th 1, 48 [32 Cal.Rptr.3d 894, 117 P.3d 591]; see *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871].)

The Eighth and Fourteenth Amendments do not require that the prosecution prove beyond a reasonable doubt the existence of aggravating circumstances, or that the aggravating circumstances outweigh the mitigating circumstances, or that death is the appropriate punishment. (*People v. Moon, supra*, 37 Cal.4th at pp. 43–44; *People v. Blair* (2005) 36 Cal.4th 686, 753 [31 Cal.Rptr.3d 485, 115 P.3d 1145].) The high court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Blakely v. Washington* (2004) 542 U.S. 296 [59 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi v. New*

---

[20] We further note that judicial notice of the court record of the guilty plea was permissible (Evid. Code, § 452, subd. (d)), and the record itself was not inadmissible hearsay (*id.*, § 1280).

*Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]) do not alter these conclusions. (*People v. Whisenhunt, supra,* 44 Cal.4th at p. 227; *People v. Moon, supra,* 37 Cal.4th at p. 44.) *Brown v. Sanders* (2006) 546 U.S. 212 [163 L.Ed.2d 723, 126 S.Ct. 884], has no bearing on this issue. In that case, the high court held a reviewing court's invalidation of one or more special circumstances did not render a California death sentence unconstitutional where other special circumstances existed that made the defendant death eligible. The case says nothing about any burden of proof at the penalty phase of a capital case.

The lack of any burden of proof or persuasion as to penalty does not violate the Eighth or Fourteenth Amendment, and the trial court does not have to instruct the jury that there is no burden of proof or persuasion. (*People v. Whisenhunt, supra,* 44 Cal.4th at p. 227; *People v. Moon, supra,* 37 Cal.4th at p. 44; *People v. Blair, supra,* 36 Cal.4th at p. 753.) Jury unanimity as to aggravating circumstances is not required. (*People v. Whisenhunt, supra,* 44 Cal.4th at p. 227; *People v. Moon, supra,* 37 Cal.4th at p. 43.)

The trial court does not have to instruct the jury that there is no burden of proof or requirement of jury unanimity as to mitigating circumstances or that there is a presumption that life without possibility of parole is the appropriate sentence. (*People v. Moon, supra,* 37 Cal.4th at pp. 43–44; see *People v. Samayoa* (1997) 15 Cal.4th 795, 852–853 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

CALJIC No. 8.88, the instruction that defines the jury's sentencing discretion and the nature of its deliberative process, is not unconstitutional for (1) failing to inform the jury that, if it finds the circumstances in mitigation outweigh those in aggravation, it is required to return a verdict of life in prison without the possibility of parole; (2) failing to inform the jury it must find the death penalty to be the appropriate penalty, not just the warranted penalty; or (3) using the phrase "so substantial." (*People v. Moon, supra,* 37 Cal.4th at pp. 42–43; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 124 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Boyette* (2002) 29 Cal.4th 381, 465 [127 Cal.Rptr.2d 544, 58 P.3d 391].) Further, although the terms "aggravating" and "mitigating" are commonly understood and do not require further elaboration (*People v. Malone* (1988) 47 Cal.3d 1, 54–55 [252 Cal.Rptr. 525, 762 P.2d 1249]), CALJIC No. 8.88 adequately defines mitigation (*People v. D'Arcy* (2010) 48 Cal.4th 257, 304 [106 Cal.Rptr.3d 459, 226 P.3d 949]; *People v. Dykes* (2009) 46 Cal.4th 731, 817 [95 Cal.Rptr.3d 78, 209 P.3d 1]). Defendant's argument that jurors would not understand the instruction's definition of aggravation is based entirely on studies not presented to the trial court. We presume that the jurors understood and followed the instruction notwithstanding "empirical assertions to the contrary based on research that is not part of the present record and has not been subject to cross examination." (*People v. Welch, supra,* 20 Cal.4th at p. 773.)

Section 190.3, factor (a), which permits the jury to consider the "circumstances of the crime" in determining the appropriate penalty, is neither vague nor overbroad, and it does not impermissibly permit arbitrary and capricious sentencing. (*People v. Whisenhunt, supra*, 44 Cal.4th at p. 228; see *Tuilaepa v. California* (1994) 512 U.S. 967, 976, 979 [129 L.Ed.2d 750, 114 S.Ct. 2630].)

The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b) (*People v. Whisenhunt, supra*, 44 Cal.4th at p. 228), jury unanimity regarding such conduct is not required (*People v. Kelly* (2007) 42 Cal.4th 763, 800 [68 Cal.Rptr.3d 531, 171 P.3d 548]), and factor (b) is not unconstitutionally vague. (*Tuilaepa v. California, supra*, 512 U.S. at p. 976.)

The trial court was not constitutionally required to instruct the jury that certain sentencing factors can be considered only in mitigation, and CALJIC No. 8.85's instruction to the jury to consider "whether or not" certain mitigating factors were present did not unconstitutionally suggest that the absence of such factors was aggravating. (*People v. Whisenhunt, supra*, 44 Cal.4th at p. 228; *People v. Moon, supra*, 37 Cal.4th at p. 42.)

Written jury findings regarding aggravating factors are not constitutionally required. (*People v. Whisenhunt, supra*, 44 Cal.4th at p. 228; *People v. Moon, supra*, 37 Cal.4th at p. 43.)

The use of the adjective "extreme" in section 190.3, factor (d), is not unconstitutional. (*People v. Whisenhunt, supra*, 44 Cal.4th at p. 228; *People v. Kelly, supra*, 42 Cal.4th at p. 801.) Nothing in *Abdul-Kabir v. Quarterman* (2007) 550 U.S. 233 [167 L.Ed.2d 585, 127 S.Ct. 1654], or *Brewer v. Quarterman* (2007) 550 U.S. 286 [167 L.Ed.2d 622, 127 S.Ct. 1706], which applied the holding of *Penry v. Lynaugh* (1989) 492 U.S. 302 [106 L.Ed.2d 256, 109 S.Ct. 2934], in the context of the Texas sentencing scheme, alters this result. (See *People v. Smithey* (1999) 20 Cal.4th 936, 1005–1006 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [§ 190.3, factors (d), (h) & (k) satisfy *Penry*'s requirement that the instructions permit the jury to give mitigating effect to evidence of a defendant's mental condition].)

The death penalty law does not violate equal protection by denying capital defendants certain procedural safeguards that are afforded to noncapital defendants because the two categories of defendants are not similarly situated. (*People v. Redd* (2010) 48 Cal.4th 691, 758 [108 Cal.Rptr.3d 192, 229 P.3d 101]; *People v. Martinez* (2010) 47 Cal.4th 911, 968 [105 Cal.Rptr.3d 131, 224 P.3d 877].)

Section 190.2, which sets out the special circumstances that render a defendant eligible for the death penalty, adequately narrows the class of

eligible offenders in conformity with the requirements of the Eighth and Fourteenth Amendments. (*People v. Hoyos* (2007) 41 Cal.4th 872, 926 [63 Cal.Rptr.3d 1, 162 P.3d 528].)

Prosecutorial discretion in the decision whether to seek the death penalty in a given case does not render the law unconstitutionally vague or arbitrary. (*People v. Harris, supra*, 37 Cal.4th at p. 366.)

Justice Blackmun's dissent from the high court's denial of certiorari in *Callins v. Collins* (1994) 510 U.S. 1141 [127 L.Ed.2d 435, 114 S.Ct. 1127], does not convince us that the death penalty is so arbitrary or unreliable as to constitute cruel and unusual punishment in violation of the Eighth Amendment. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321].) Similarly, the increasing barriers to postconviction relief in state and federal courts, as outlined by Justice Blackmun in his concurring opinion in *Sawyer v. Whitley* (1992) 505 U.S. 333, 357–360 [120 L.Ed.2d 269, 112 S.Ct. 2514], do not provide a basis for relief on direct appeal. (*People v. Redd, supra*, 48 Cal.4th at p. 758; *People v. Demetrulias* (2006) 39 Cal.4th 1, 44 [45 Cal.Rptr.3d 407, 137 P.3d 229].)

The slow pace of executions in California, which defendant contends is similar to the conditions condemned by Judge Noonan in his dissenting opinion in *Jeffers v. Lewis* (9th Cir. 1994) 38 F.3d 411, 425–427, does not render our system unconstitutionally arbitrary. (*People v. Redd, supra*, 48 Cal.4th at pp. 758–759; *People v. Demetrulias, supra*, 39 Cal.4th at pp. 44–45.)

The alleged inconsistency between regular imposition of the death penalty and international norms of human decency does not render that penalty cruel and unusual punishment under the Eighth Amendment (*People v. Moon, supra*, 37 Cal.4th at pp. 47–48); nor does "regular" imposition of the death penalty violate the Eighth Amendment on the ground that " '[i]nternational law is a part of our law' " (*People v. Blair, supra*, 36 Cal.4th at p. 755). To the extent defendant contends the errors and due process violations that occurred at his trial also violate international law, his claim fails because we have found no such errors or due process violations. International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. (*People v. Whisenhunt, supra*, 44 Cal.4th at p. 228; *People v. Harris, supra*, 37 Cal.4th at p. 366.)

### 4. *Denial of Special Instructions Requested by the Defense*

The defense requested 21 special jury instructions at the penalty phase. The trial court agreed to give four but rejected the others on the ground that the

standard CALJIC instructions, particularly CALJIC Nos. 8.85 and 8.88, adequately conveyed their substance. Defendant contends the court's refusal to give all or part of seven of the rejected special instructions (special instructions H, I, J, N, P, R, and T) violated state law and his rights to trial by jury, a reliable penalty verdict, equal protection, and due process of law under the federal Constitution's Sixth, Eighth and Fourteenth Amendments.

The trial court did not err. We repeatedly have held the trial court does not have to instruct the penalty phase jury that (1) the list of mitigating circumstances in the standard instructions is not exclusive, or that a juror may find that a mitigating circumstance exists if there is any substantial evidence to support it, no matter how weak (special instruction H); (2) there is no requirement that all jurors agree on any factor in mitigation (special instruction N); (3) a single factor in mitigation may outweigh any number of factors in aggravation, or that a verdict of life in prison without the possibility of parole is required if the jurors are not persuaded beyond a reasonable doubt that aggravation substantially outweighed mitigation or conclude that mitigation is equal to or outweighs aggravation, or that the jury may return a verdict of life in prison without the possibility of parole even if it concludes the factors in aggravation outweigh the factors in mitigation (special instruction P) (*People v. Kelly, supra*, 42 Cal.4th at p. 799; *People v. Barnett* (1998) 17 Cal.4th 1044, 1176–1177 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People v. Hines* (1997) 15 Cal.4th 997, 1068–1070 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People v. Breaux* (1991) 1 Cal.4th 281, 314–315 [3 Cal.Rptr.2d 81, 821 P.2d 585]); or (4) the law considers death to be a more extreme punishment than life in prison without the possibility of parole (special instruction T) (*People v. Cowan* (2010) 50 Cal.4th 401, 500–501 [113 Cal.Rptr.3d 850, 236 P.3d 1074]; *People v. Cook* (2007) 40 Cal.4th 1334, 1363 [58 Cal.Rptr.3d 340, 157 P.3d 950]; *People v. Ochoa, supra*, 19 Cal.4th at pp. 478–479).

■ Defense special instruction R would have told the jurors that, if they had a doubt about which penalty was appropriate, they had to give defendant the benefit of that doubt and fix the penalty at life in prison without the possibility of parole. In previous cases, we have held a penalty phase jury does not have to be instructed to give the defendant the benefit of the doubt and impose life without possibility of parole if it has a *reasonable* doubt about which penalty to impose. (*People v. Roldan* (2005) 35 Cal.4th 646, 741 [27 Cal.Rptr.3d 360, 110 P.3d 289]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1160 [124 Cal.Rptr.2d 373, 52 P.3d 572].) Such an instruction is inaccurate because the beyond-a-reasonable-doubt standard is inapplicable to the penalty determination. (E.g., *People v. Hines, supra*, 15 Cal.4th at p. 1069.) Here, although the requested instruction omitted the word "reasonable," the outcome is the same. As we have explained, trial courts need not and should not instruct the jury regarding any burden of proof or persuasion at the penalty phase. (*People v. Collins* (2010) 49 Cal.4th 175, 261 [110

Cal.Rptr.3d 384, 232 P.3d 32]; *People v. Blair, supra,* 36 Cal.4th at p. 753.) Contrary to this rule, the proposed instruction, with its reference to "doubt," implies the existence of a burden of proof and is the functional equivalent of an instruction that there is a presumption that life in prison without the possibility of parole is the appropriate sentence. The death penalty statute does not incorporate such a presumption. (See *People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Defendant's analogy to *People v. Dewberry* (1959) 51 Cal.2d 548 [334 P.2d 852] is misplaced. *Dewberry* stands for the proposition that "when the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense, the jury must be instructed that if they entertain a reasonable doubt as to which offense has been committed, they must find the defendant guilty only of the lesser offense." (*Id.* at p. 555.) These principles have no application in the capital sentencing context, which involves a normative judgment rather than a burden of proof. (See *People v. Taylor, supra,* 48 Cal.4th at p. 658; *People v. Gamache, supra,* 48 Cal.4th at p. 407.)

Defendant further contends the trial court erred when it refused to give defense requested special instructions I and J, which highlighted specific defense evidence and issues.[21] The court properly rejected the instructions as

---

[21] Defendant's special instruction I read: "In determining whether any circumstance has been presented which extenuates the gravity of the present offenses, even though not an excuse for said crimes, you may consider, but are not limited to any of the following: [¶] 1. Whether the manner in which the crime was carried out demonstrated lack of premeditation, deliberation or intent; [¶] 2. Whether the manner in which the crime was carried out demonstrated lack of sophistication or professionalism on the part of the defendant; [¶] 3. Whether the defendant did not attempt to flee or escape when accused of the crime, or attempt to use force or violence in an effort to avoid arrest; [¶] 4. Whether the defendant participated in the crime under circumstances of coercion or duress, or his conduct was partially excusable for some other reason not amounting to a defense; [¶] 5. Whether defendant committed the crime while under the influence of a mental or emotional disturbance, even though the disturbance was not extreme, nor that it amounted to legal insanity or an inability to form a specific intent; [¶] 6. Whether the defendant committed the crime while his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired due to the effects of intoxication; [¶] 7. Whether the evidence, although not establishing reasonable doubt, creates a lingering or residual doubt concerning the defendant's guilt of the present crimes. [¶] As instructed, mitigating factors include any sympathetic, compassionate, merciful or other aspect of the defendant's background, character, record or social, psychological or medical history, which is offered as a basis for a sentence less than death, whether or not related to the offenses for which he stands convicted. [¶] Among the mitigating factors which you may consider, and which relate to the defendant, are the following: [¶] 1. Whether the defendant's psychological growth and development affected his adult psychology and personality; [¶] 2. Whether the defendant suffered any emotional or psychological problems as an adolescent that prevented him from acquiring necessary social skills; [¶] 3. Whether the defendant was a loving and helpful person in his relationships with his friends and relatives; [¶] 4. The likely effect of a death sentence on the defendant's family and friends; [¶]

argumentative and duplicative of CALJIC No. 8.85, which lists the aggravating and mitigating factors the jury may consider, and CALJIC No. 8.88. (See *People v. Gutierrez, supra*, 28 Cal.4th at p. 1159 & fn. 12; *People v. Hines, supra*, 15 Cal.4th at pp. 1067–1068 & fn. 18; *People v. Sanders* (1995) 11 Cal.4th 475, 559–561 [46 Cal.Rptr.2d 751, 905 P.2d 420].) Although defendant's proposed instructions differed from those in the cited cases because each item of defense evidence was prefaced with the word "whether," this is a distinction without a difference. Defendant's instructions as a whole impermissibly invited the jury to " ' "draw inferences favorable to [defendant] from specified items of evidence." ' " (*People v. Sanders, supra*, 11 Cal.4th at p. 560.)

Defendant asserts the cumulative effect of the erroneous denial of his requested instructions was to mislead the jury as to its proper sentencing function. Because we find no error, there is no prejudice to cumulate.

## 5. *Cumulative Error*

Defendant contends the cumulative impact of the errors of state and federal law that occurred at the guilt and penalty phases of his trial rendered the trial fundamentally unfair and its results unreliable, requiring reversal of the guilt, special circumstances, and penalty judgments. Again, as we have found no error, there is no cumulative impact of errors in this case.

---

5. Whether the facts in the defendant's upbringing, early family life, and childhood contributed to his conduct; [¶] 6. Whether the defendant had a history of alcohol and/or substance abuse or addiction, and whether such abuse and/or addiction had an effect on his behavior and which [*sic*] contributed to his criminal conduct; [¶] 7. Whether the defendant has positively adjusted to the type of structured and institutionalized environment in which he will live the rest of his life if given a sentence of life in prison without the possibility of parole; [¶] 8. Whether the defendant's age evidenced a lack of maturity or emotional development at the time of the commission of the crime; [¶] 9. Whether the defendant has the willingness and ability to comply with the terms of a sentence of life without the possibility of parole; [¶] 10. Whether the defendant has the potential for rehabilitation and for contributing affirmatively to the lives of his family, friends, and fellow inmates; [¶] 11. Whether or not the defendant will be a danger to others if sentenced to life imprisonment without the possibility of parole; [¶] 12. Whether any other facts exist which may be considered as extenuating or reducing the defendant's degree of moral culpability for the crime committed, or which might justify a sentence of less than death even though such facts would not justify or excuse the offense." Defendant's special instruction J read in pertinent part: "In [mitigation], you must consider the defendant's background, character, history, and any devotion or affection for his family and they for him. You must also consider anything favorable to him during his life or any other mitigating circumstance. [¶] In considering this evidence, you are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you find are relevant."

### III. Disposition

We affirm the judgment.

Cantil-Sakauye, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied April 13, 2011.