Filed 2/4/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES HENRY WEAR,<br><br>    Defendant and Appellant. | A152732<br><br>(Alameda County<br>Super. Ct. No. H58247) |

Defendant James Wear arranged to meet an acquaintance, Ryan Rossknecht, and went to the meeting with a friend, Brandon Lowell. Wear apparently intended to buy or steal a gun from Rossknecht and possibly to supply him with heroin. The evidence suggested that an argument arose during the meeting, and Rossknecht, who had two guns with him, shot Lowell once with one of them. Wear, who was unarmed, then seized that gun, shot Rossknecht twice with it, and fled with the other gun. Lowell and Rossknecht died of their injuries.

Wear was charged with the murders of both Lowell and Rossknecht. As to the charge involving Lowell, the jury was unable to return a verdict. As to the charge involving Rossknecht, the jury found Wear guilty of first degree murder and found true an allegation that Wear personally and intentionally discharged a firearm causing the death, but it was unable to return a verdict on a special-circumstance allegation that Wear murdered Rossknecht during a robbery. After Wear admitted two prior convictions, one of which was a strike, the trial court sentenced him to 80 years to life in prison.

On appeal, Wear claims there was insufficient evidence to convict him of first degree murder of Rossknecht on either of the theories presented: felony murder during a robbery and premeditated murder. We conclude there was sufficient evidence of felony

1

murder but insufficient evidence of premeditated murder. Because the record affirmatively shows that some jurors convicted Wear based on the insufficiently supported premeditated-murder theory, we must reverse.[1]

I.
FACTUAL AND PROCEDURAL
BACKGROUND

*A.      Background*

Wear and Lowell grew up in Livermore and were good friends. At the time of the killings on March 1, 2015, they had recently begun living together, along with their respective girlfriends, in a home in Mountain House. Wear, who was 28 years old, and Lowell, who was around the same age, regularly used and sold drugs, including heroin.

Wear and 22-year-old Rossknecht, who was also from Livermore, were acquaintances. Rossknecht was addicted to heroin and on probation for selling drugs, and he had entered a drug rehabilitation program in Hayward about two weeks before his death. He sometimes visited his parents' house in Livermore and, because he did not have a cell phone, used their home phone to make and receive calls.

Taylor O. was a mutual acquaintance of Rossknecht and Wear's and also grew up in Livermore. Her boyfriend at the time had been friends with Rossknecht since childhood. Two days before the killings, Rossknecht talked with Taylor O. on the phone. He wanted to hang out with her and her boyfriend, who were also heroin addicts, and wanted to obtain a small amount of heroin. Taylor O. and her boyfriend were unavailable because they were staying at a Tracy hotel, and she told Rossknecht he could probably get heroin from Wear, whom she knew sold it.

Taylor O. was aware that Wear and Rossknecht "didn't really like each other too much." Both men had independently talked to her about "a falling out" they had at least

---

[1] The parties agree that we therefore need not reach Wear's other claims, including that his trial counsel rendered ineffective assistance by failing to present evidence on the meaning of a slang phrase—"hitting a lick"—Wear used in a text message sent shortly before the killings. In a separate matter, Wear filed a petition for writ of habeas corpus in which he claims that counsel rendered ineffective assistance based on the same omission. By separate order in the habeas matter, No. A157630, we deny the petition as moot.

2

a year before the killings over a drug "transaction that went bad." Taylor O. had not, however, heard either Wear or Rossknecht threaten the other.

Rossknecht asked for Wear's contact information, and Taylor O. decided she had to check with Wear first. She immediately called Wear, who, despite any dislike of Rossknecht, responded "enthusiastic[ally]" when Taylor O. asked if she could give Rossknecht his phone number. A minute later, Rossknecht called her again, and she gave him Wear's number. Phone records showed that after his phone calls with Taylor O., Rossknecht had four calls with Wear over the next hour or so, one of which lasted over 10 minutes. The two men also spoke twice the following evening, which was the night before the killings.

### B.    March 1

On March 1, around 2:00 p.m., Rossknecht used his parents' home phone to call Taylor O.'s boyfriend, who put the call on speakerphone so Taylor O. could join the conversation. Taylor O. testified that Rossknecht "wanted someone to go with him" to meet an unidentified person to "sell [a] gun because he needed money and whatever, just wanted to get rid of it."[2] Taylor O. and her boyfriend told Rossknecht they could not go with him because they were at her parents' house trying to withdraw from heroin. Rossknecht said he was about to leave his parents' house to conduct the gun sale, and he did not seem too concerned that the couple could not accompany him.

Rossknecht's mother indicated that around 3:00 p.m. she saw her son talking on the home phone and heard him say, "Silver 4" or "400." Phone records showed that Rossknecht spoke to Wear at 2:49 p.m. Phone records also showed that after this call with Wear, Rossknecht repeatedly called Xavier C., a childhood friend. At 3:13 p.m., Xavier C. returned Rossknecht's call and spoke to him for about a minute. Xavier C. testified that Rossknecht asked to hang out, and Xavier C. said he was not at home but

---

[2] At the time she testified, Taylor O. recalled that both a silver gun and a black gun were mentioned during the conversation, but she could not remember which Rossknecht intended to sell. Shortly after the killings, however, Taylor O. told the police that Rossknecht was planning to sell a silver .357 revolver.

3

could meet after he returned. Rossknecht immediately had another call with Wear, told his mother he was going to see Xavier C., and left.

Rossknecht's father testified that after his son's death, Xavier C. told him that Rossknecht had two guns stored at Xavier C.'s house. According to Rossknecht's father, Xavier C. said that on the day in question he had arranged to go with Rossknecht "to meet two guys to sell this gun." Rossknecht's father also testified that Xavier C. had told him that Rossknecht "wanted Xavier to be there [for the sale] 'cause in his words, he said those two guys were sketchy." At trial, Xavier C. denied that Rossknecht mentioned selling guns, that he had stored guns for Rossknecht, or that he had told Rossknecht's father anything to this effect. Xavier C. did admit, however, that he found Rossknecht's keys in his house after the shootings, establishing that Rossknecht had been there that day while Xavier C. was out.

That afternoon, Wear and Lowell went to meet Rossknecht. Neither Wear nor Lowell brought a gun to the meeting. Lowell had won a significant amount of money at Livermore Casino the night before, and he planned to return to the casino that afternoon with a good friend, Jason M. Shortly after 3:00 p.m., Lowell, who had spent the night at the Mountain House residence, texted Jason M. that he was about to leave. Lowell's girlfriend testified that Wear and Lowell left together in Lowell's car, a white Honda.

The evidence tended to show that Wear, Lowell, and Rossknecht met up around 3:20 p.m. A surveillance video recording played for the jury showed that around that time, "a white vehicle" pulled into a McDonald's parking lot, "two subjects . . . came out of the vehicle, and a third subject met up with them." Rossknecht's car, a white Buick, was found in the lot after the shootings.

Around the time the three men met at McDonald's, Wear's girlfriend texted Wear, "Really james," after he failed to respond to several text messages she had sent in the previous hour.[3] About 20 minutes later, at 3:51 p.m., Wear sent her a text that said, "Im

_____

[3] Unless otherwise noted, text messages are quoted verbatim, without corrections. As discussed in more detail below, Wear and his girlfriend exchanged numerous text

4

hittin,a lick,,stop." Inspector Gus Galindo, a district attorney investigator who had "learned certain street slang that's associated with crime" during his law enforcement career, testified that the term "hitting a lick" means "doing a robbery or burglary" or "some type of crime . . . where you're coming up on an easy score." Under further questioning, Inspector Galindo confirmed that the term referred to "a taking of property" and testified, "It's basically street slang for robbery, robbing somebody of something."

### C.    The Shootings

The shootings occurred around 4:30 p.m. in the Springtown neighborhood of Livermore, at the intersection of Altamont Creek and Winding Stream, around the corner from Xavier C.'s house. The witnesses' testimony and other evidence suggested that while Lowell waited in his parked car at the intersection, Wear and Rossknecht retrieved the gun Rossknecht was planning to sell (a silver Smith and Wesson) from Xavier C.'s house. After Wear and Rossknecht returned to Lowell's car, an argument ensued, and Rossknecht shot Lowell with the Smith and Wesson. Wear then seized that gun, shot Rossknecht with it, and fled with a second gun of Rossknecht's (a Ruger).

A woman attending a party at her aunt's house on Winding Stream testified that around 4:00 p.m., as she was loading items into her car to leave, she saw a light-colored Honda pull up to the curb on Altamont Creek. There was one person in the car, who had short hair and was wearing a baseball hat. The woman went back into her aunt's house, and when she came out again about five minutes later, the same person was still in the car. The woman noticed that the person had his or her "head down," as if texting.

The phone records suggested that this person was Lowell, who was the only one of the three men who sent any text messages between 3:55 p.m. and 4:30 p.m. The messages Lowell sent before his death do not hint that he anticipated anything out of the ordinary was imminent. He exchanged several innocuous messages with his girlfriend and another acquaintance. In addition, at 3:52 p.m., Jason M. texted Lowell to ask if he was on the way so they could go to the casino, and Lowell responded that he would "be

messages throughout the morning and afternoon of March 1. Wear and his girlfriend apparently got married several months before trial, and she did not testify.

there shortly." Jason M. then asked whether he had "10 min to shower," and Lowell responded, "Yup handle it..bringing james too ok." Jason M. asked when Lowell expected to arrive, and at 4:11 p.m., Lowell texted it would be "10 to 15."

Around 4:30 p.m., a female teenager walking down Winding Stream with her mother heard two or three men "yelling at each other" in an "angry" tone. The noise was coming from Lowell's car, which was still parked on Altamont Creek. Similarly, a preteen boy who was also walking down Winding Stream testified that he heard three voices arguing from the direction of a parked car. He saw two men standing on the curb, most likely Wear and Rossknecht, arguing with a third person sitting in the car's driver's seat, most likely Lowell.[4] The female teenager also saw one person sitting in the front seat.

The female teenager testified that after hearing the argument, she heard a gunshot "[f]rom . . . next to the car," which caused her to look over and see that its front "passenger side door was open and there was a person like pointing into the—like with their arms out into the car." Similarly, the teenager's mother testified that she heard a "pop" and saw a man stretching his arms toward the open passenger-side door of the car. The mother described this man as wearing a baseball hat, long, red-and-black gym shorts, "and probably some kind of short-sleeve shirt, because [she] remember[ed] seeing . . . [a] bare upper arm[]," a description closely matching Rossknecht's clothing. On the other hand, both she and her daughter described this shooter as average height with a "[t]hin" to "average" build, a description that more closely matched Lowell, who was five feet, eleven inches tall and weighed about 185 pounds, or Wear, who also had an average

---

[4] The preteen boy testified that one of the men on the curb was wearing blue jeans and a black hooded jacket and the other was wearing white cargo shorts and a white short-sleeve t-shirt, but none of these descriptions clearly matched any of the three men. The boy identified the person with jeans and a black jacket as Lowell, but Lowell was wearing a short-sleeved dark t-shirt and gray shorts. Rossknecht was wearing black, gray, and red shorts and a black tank top, and when arrested later that night Wear was wearing a black hooded sweatshirt and tan cargo pants.

build, than it did Rossknecht, who was approximately six feet, three inches tall and weighed around 225 pounds.

The female teenager's mother observed a struggle behind the passenger door after the first shot was fired, and both she and her daughter testified that after a pause of a few seconds following the first gunshot, there were two more shots in quick succession. Three other witnesses also described hearing three gunshots. Two of those witnesses testified that there was a pause of a few seconds between the first and second gunshots and that the third gunshot immediately followed the second, echoing the testimony of the female teenager and her mother. But the preteen boy indicated that "[t]here was a little pause between the first and second and a longer pause between [the] second and third."

A neighbor who lived on Winding Stream testified that after he heard the gunshots, he went out to the street and saw a man he identified as Wear "slamming the passenger side door" of Lowell's car on what appeared to be the head of Lowell, who was kneeling.[5] The neighbor yelled at Wear, "Hey, what the hell [are] you doing?" Wear turned, looked at the neighbor, and stepped back from the car, allowing Lowell's body to fall facedown onto the ground.

As the neighbor tried to note the car's license plate number, he saw a third man, later identified as Rossknecht, lying in the gutter. The neighbor saw Wear dragging Lowell's body and noticed that Wear was holding a silver handgun. Wear deposited Lowell on the grass alongside where the car was parked, dropped the gun next to him, and got in the car and drove away.

D.    *Physical Evidence*

Another neighbor called 911, and Livermore police officers dispatched to the scene arrived shortly after 4:30 p.m. Rossknecht was lying partially in the gutter, with his head facedown in the street in a pool of blood and his right leg on the grass next to the

---

[5] Lowell's autopsy did not show any blunt trauma to his head except a scrape on his lip, and Rossknecht's head did not exhibit blunt trauma either. Around the same time, the female teenager's mother heard a voice say, "Get in the car. Just get in the car," suggesting the neighbor may have mistakenly interpreted what was actually Wear's attempt to get Lowell into the passenger seat.

7

curb, and Lowell was lying on the grass next to Rossknecht. Rossknecht was wearing "shorts . . . that were pulled down below his buttocks," and there were "four linear blood stains" near his right hip consistent with finger marks, as well as what appeared to be a bloody footprint on his boxer shorts. There was also "a very small blood stain" on the inside seam of the shorts' pocket that had not leaked through from the outside, suggesting a bloody hand might have been inserted into the pocket. Tire tracks in blood that began near Rossknecht's head demonstrated that a car had made a U-turn and traveled away on Altamont Creek.

Lowell died of a single gunshot wound to his chest. He had significant levels of methamphetamine and amphetamine in his system, as well as a "potentially toxic level" of heroin.

Rossknecht died of two gunshot wounds to his head, one in the forehead and one in the right ear. The forehead wound "had very heavy deposition of . . . gunshot stippling," which indicated the barrel of the gun had been close to his head. Burnt tissue around the ear wound indicated it "could have been a contact, or a near contact, wound." The autopsy revealed that Rossknecht had a "very high" level of heroin in his system.

A gun case lying upside down in the gutter, near Rossknecht's head, contained a Glock bullet loader. A box cutter with its blade extended, identified as a tool Lowell used to cut drugs, was lying near Rossknecht's feet and had Rossknecht's blood on the handle. A silver .357 caliber Smith and Wesson revolver was on the grass a few feet away from the bodies.

Meanwhile, around 4:30 p.m. a woman noticed a light-colored Honda come in "really fast" and circle the parking lot of a Jehovah's Witnesses Kingdom Hall about a mile from the scene. An unloaded .357 caliber Ruger revolver was later found on the sidewalk near the Hall.

Although cartridge cases and bullets recovered from the scene could not be "conclusively link[ed]" to the Smith and Wesson, their "class characteristics" were consistent with having been shot from that gun, and they could not have been shot by the Ruger. The Smith and Wesson had a mixture of Lowell's and Rossknecht's DNA on its

8

grip and Lowell's blood on the barrel, and the Ruger was covered in Rossknecht's blood. Neither gun had fingerprints on it.[6]

The Smith and Wesson was in working order, and the evidence tended to show it was fired once, a live round was skipped, and then it was fired twice more. A firearms expert testified that this could occur if the trigger was pulled slightly, without firing the gun, causing the cylinder to unlock and allowing it to be rotated either "by hand" or "by, say, a scratch against your hand, against clothing, anything along those lines." On cross-examination, the expert agreed the required movement could have resulted from "a struggle with someone who is trying to stop the person from firing the weapon."

The day after the shootings, Lowell's car was recovered in Tracy. A blood smear in the shape of the Ruger was on the front passenger seat, and there was blood on the gear shift knob. There was also blood all over the steering wheel and the driver's-side floor, suggesting the car could was driven by someone with bloody feet and hands.

Rossknecht's blood was on the passenger door, including "high velocity blood spatter" on its underside that could only have been deposited "if the victim was on the ground." Specifically, it could not have been caused by blood spattering if a person was shot and then fell to the ground while bleeding. There was also "blood spatter all over the interior of the door," including on the door's hinge, which demonstrated that the blood was deposited when the door was open. In addition, other evidence suggested the car was driven over Rossknecht's arm.

### E.     Wear's Subsequent Actions and Arrest

Lowell's girlfriend testified that when she returned to the Mountain House residence from shopping at around 5:00 p.m., she saw through a window that Wear was moving around in his and his girlfriend's bedroom. While putting her groceries away, Lowell's girlfriend got the impression that Wear and his girlfriend were fighting, because Wear was yelling at his girlfriend and they were moving quickly. The couple then left

---

[6] Gunshot residue particles were found on the hands of all three men, indicating that the men were "in close proximity or in the vicinity of a gun being fired" but not necessarily that any of them shot the gun.

together in their car. Lowell's girlfriend testified that as they pulled out, Wear was "staring" at her with "a scary stare[,] . . . non-blinking."

Wear repeatedly called and texted Taylor O. beginning around 5:40 p.m. She texted him that she could not talk to him, and he texted back, "Ill burn so fat wit yall please lemme slide thru." Taylor O. testified that she understood him to be saying that he would "smoke [heroin] with [her and her boyfriend] if [they] let him come to where [they were] at," and she assumed "he believed [they] were still at the hotel" in Tracy. When she texted him, "Are u good?," he responded, "Nope notbatvall." A few hours later, shortly before 8:00 p.m., Wear texted Taylor O.'s boyfriend, "Jus so u know ur bpt got shot in thebface,,,,maybe now ill call."

Meanwhile, at around 5:30 p.m., after his texts to Lowell had gone unanswered, Jason M. texted Wear, "You guys ok?" Wear immediately responded, "Naw," but then did not respond to Jason M.'s subsequent attempts to communicate with him. Over an hour later, shortly before 7:00 p.m., Jason M. called Lowell's phone and Wear answered. Jason M. testified that he asked Wear what was going on, and Wear said he and Lowell had been buying a gun from a third person whom he did not identify. Wear "said there was a wrestling match" between Lowell and the other person, "and [Lowell] was shot and the gun was wrestled away from the person; they took two to the head." Wear, who "seemed shocked by the incident," told Jason M. that Lowell was "going to be all right" and was "headed to the hospital."

Lowell's girlfriend also repeatedly tried to reach Lowell that evening, but her texts and calls went unanswered. Right after hanging up with Jason M., Wear finally picked up a call on Lowell's phone from Lowell's girlfriend. Lowell's girlfriend could barely understand Wear, who was "mumbling the majority of the time," and the only thing she could remember Wear saying was, "He got away."

Nicholas P., also a heroin addict, had been friends with Lowell and Wear since middle school. He called Lowell's phone around 8:30 p.m., after he learned there had been a shooting in Livermore. Wear answered, and Nicholas P. asked what was happening. Wear, who was "clearly high" based on his speech, said that he, Lowell, and

10

Rossknecht got together "to handle something," Lowell and Rossknecht got into a physical fight, and Rossknecht shot Lowell.

According to Nicholas P., Wear, who seemed "in distress to some extent," indicated that after Rossknecht shot Lowell, Wear "had to get the gun away from [Rossknecht] and shoot him to, basically, . . . defend him, defend [Lowell], defend themselves." Wear also said something about taking the gun and Rossknecht getting "hit in the face twice." Nicholas P. testified that he had the "impression" that Wear "had to do whatever [he] did because of the fact that . . . [Lowell] was shot" and "didn't get the impression that it was just something like, 'Oh, I just went there and shot this dude.' It was because it was in reaction to whatever had just taken place."

Around 8:40 p.m. that night, the Livermore police found Wear in Springtown and arrested him. He was in possession of both his and Lowell's cell phones. He was also in possession of 38.38 grams of heroin, an amount indicating possession for sale; drug paraphernalia; and $140 in cash. The parties stipulated that Wear's blood was drawn several hours later and contained both heroin and methamphetamine.

### F. The Verdicts and Sentencing

Wear was charged with one count of murder of Rossknecht and one count of murder of Lowell.[7] Both counts were accompanied by a special-circumstance allegation that the murder was committed during a robbery or attempted robbery and by various other enhancement allegations, including an allegation that Wear personally and intentionally discharged a firearm causing death.[8] A multiple-murder special

---

[7] The murder counts were brought under Penal Code section 187, subdivision (a). All further statutory references are to the Penal Code.

[8] The robbery special-circumstance allegations were made under section 190.2, subdivision (a)(17)(A). The other enhancement allegations accompanying the murder counts were made under section 12022.53, subdivisions (b) (personal use of a firearm), (c) (personal and intentional discharge of a firearm), and (d) (personal and intentional discharge of a firearm causing death); section 12022.5, subdivision (a) (personal use of a firearm during a felony); and section 12022.7, subdivision (a) (personal infliction of great bodily injury during a felony).

11

circumstance was also alleged, as well as prior convictions for shooting at an inhabited building, a serious felony, and grand theft.[9]

The Rossknecht murder charge was prosecuted under two theories: felony murder and premeditated murder. As we discuss further below, the record affirmatively demonstrates that in convicting Wear of first degree murder of Rossknecht, some of the jurors believed Wear was guilty under the felony-murder theory, while others believed he was guilty under the premeditated-murder theory. The jury also found true that Wear personally and intentionally discharged a firearm causing Rossknecht's death, but it was unable to return a verdict on the accompanying robbery special-circumstance allegation. Nor did it return a verdict on the count of murder of Lowell and its associated enhancements. The trial court declared a mistrial as to the Rossknecht robbery special-circumstance allegation and the Lowell murder count, and it later granted the prosecution's request to dismiss these charges "in the interest of justice and actually for lack of sufficient evidence."

Wear was sentenced to a total term of 80 years to life in prison, composed of a term of 25 years to life, doubled, for Rossknecht's murder, and consecutive terms of 25 years to life for the firearm enhancement and five years for the prior conviction of a serious felony.

## II.
### DISCUSSION

Wear claims that insufficient evidence supports either theory of first degree murder on which the jury was instructed. We conclude that sufficient evidence supports a conviction based on felony murder but does not support a conviction based on

---

[9] The multiple-murder special circumstance was alleged under section 190.2, subdivision (a)(3), and the alleged prior convictions were under sections 246 (shooting at inhabited dwelling) and 487, subdivision (c) (grand theft).

premeditated murder. Because the record affirmatively indicates that some jurors relied on the premeditation theory to convict, reversal is required.[10]

### A. General Legal Standards

In evaluating a claim that a conviction lacks sufficient evidence, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) We focus " 'on the *whole* record of evidence presented to the trier of fact, rather than on " 'isolated bits of evidence.' " ' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1329.) " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*In re George T.* (2004) 33 Cal.4th 620, 631; see *People v. Solomon* (2010) 49 Cal.4th 792, 811–812.) Instead, reversal is required only if " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

Given this deferential standard of review, a "defendant bears an enormous burden in claiming there is insufficient evidence" to support a conviction. (*People v. Veale* (2008) 160 Cal.App.4th 40, 46.) Nevertheless, there must be "substantial evidence," that is, evidence that is " ' "reasonable . . . , credible, and of solid value." ' " (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1363.) In particular, a reasonable inference from the evidence " ' "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an

---

[10] Wear originally took the position that reversal was not required unless there was insufficient evidence to support both theories of first degree murder. We requested supplemental briefing on this issue, at which point the Attorney General conceded that reversal was required if we concluded that the premeditated-murder theory lacked substantial evidence.

inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "All murder that is perpetrated by . . . willful, deliberate and premeditated killing . . . or that is committed in the perpetration of" certain specified felonies, including robbery, "is murder of the first degree." (§ 189, subd. (a).) "Felony murder and premeditated murder are not distinct crimes, and need not be separately pleaded." (*People v. Nakahara* (2003) 30 Cal.4th 705, 712.) Thus, "jurors need not unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation" in order to convict a defendant of that crime. (*Ibid.*)

Premeditated murder and felony murder do, however, " 'have different elements even though there is but a single statutory offense of murder.' " (*People v. Benavides* (2005) 35 Cal.4th 69, 101.) "In the context of first degree murder, ' "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*People v. Lee* (2011) 51 Cal.4th 620, 636 (*Lee*).) The required mind state "is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*People v. Chiu* (2014) 59 Cal.4th 155, 166.) "[T]he reflection necessary to establish premeditation and deliberation is not measured by duration of time: 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides . . . which are the result of mere unconsidered or rash impulse hastily executed.' " (*People v. Wright* (1985) 39 Cal.3d 576, 593.)

In contrast, "[t]he felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state" vis-à-vis an intent to kill. (*People v. Chun* (2009) 45 Cal.4th 1172, 1182.) "For

14

conviction, the prosecution must establish that the defendant, either before or during the commission of the acts that caused the victim's death, had the specific intent to commit one of the listed felonies." (*People v. Lewis* (2001) 25 Cal.4th 610, 642.)

Generally speaking, "[w]hen a jury is instructed on two theories of first degree murder, a first degree murder verdict will be upheld [even] if there is insufficient evidence as to one of the theories." (*People v. Sandoval* (2015) 62 Cal.4th 394, 424.) In such cases, where "the inadequacy of proof" as to one of the theories of first degree murder is "purely factual," it is presumed that the jury is "fully equipped to detect" the deficiency and must have relied on the other, factually valid theory. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

But this presumption does not apply if there is "an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*People v. Guiton*, *supra*, 4 Cal.4th at p. 1129.) Here, it is clear that some of the jurors accepted the premeditated-murder theory and others accepted the felony-murder theory. On the second day of deliberations, the jury sent a note to the trial court that stated, "The jurors are split over (1) malice aforethought [and] (2) felony murder. Some agree that (1) has been proven but not (2). [¶] Some believe (2) has been proven but not (1). [¶] Our understanding is that if all jurors agree to one or the other, this is sufficient to find the defendant guilty [of] the crime of murder in [the] first degree." The court sent a response confirming that the jurors "[did] not all need to agree on the same theory" to convict Wear of first degree murder.

The following day, the jury informed the trial court that it was split, by a vote of eight to four, on the Lowell murder charge. After further deliberation, the jury informed the court that it was also split on the Rossknecht robbery special circumstance, by a vote of ten to two. The court ultimately declared a mistrial on both the Lowell murder charge and the Rossknecht robbery special circumstance based on this impasse, which further confirmed that not all the jurors were convinced the shootings happened in the course of a robbery.

15

Thus, the record contains affirmative indications that some jurors convicted Wear of first degree murder based on the felony-murder theory and others did so based on the premeditated-murder theory. As a result, we must reverse unless substantial evidence supports *both* theories. (See *People v. Nelson* (2016) 1 Cal.5th 513, 552.)

B.      *There Is Substantial Evidence of Felony Murder Based on Robbery.*

"Robbery is the felonious taking of personal property in the possession of another, from his [or her] person or immediate presence, and against his [or her] will, accomplished by means of force or fear." (§ 211.) "[T]o find a defendant guilty of first degree murder based on a killing perpetrated during a robbery, the evidence must show the defendant intended to steal the victim's property either before or during the fatal assault." (*People v. Lewis*, *supra*, 25 Cal.4th at p. 642.) But " 'if the intent arose only after the use of force against the victim, the taking will at most constitute a theft.' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1030, quoting *People v. Morris* (1988) 46 Cal.3d 1, 19; *People v. Green* (1980) 27 Cal.3d 1, 54.) " ' " '[W]hen one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.' " ' " (*Potts*, at p. 1030.)

Wear claims there was insufficient evidence that he "exerted force for the specific purpose of obtaining the Ruger," since the only "reasonable conclusion" from the evidence is that he, Lowell, and Rossknecht "met up for a gun sale, the shooting was unplanned[,] and Wear took the Ruger as a panicked afterthought when Rossknecht dropped it during the struggle." We are not persuaded. To begin with, while it is true that substantial evidence indicated Wear planned to buy a gun from Rossknecht, it is also true that substantial evidence indicated that Wear intended to steal a gun from the other man. At 3:51 p.m., after he and Lowell had already met up with Rossknecht, Wear sent a text message to his girlfriend saying he was "hittin a lick," and Inspector Galindo testified that the term was slang for a robbery or burglary. The jury could reasonably infer from this evidence that Wear, who was in the middle of the interaction set up as a gun sale, actually intended to rob Rossknecht.

16

We recognize that, as Wear argues, the term is susceptible to other interpretations, such as indicating that he was planning to pay Rossknecht less than the gun was worth. Even if evidence of those other interpretations had been admitted, however, it would not negate Inspector Galindo's interpretation, on which the jury could reasonably rely to conclude that Wear intended to rob Rossknecht. The jury could also reasonably infer that Wear intended to rob Rossknecht of a gun in particular, since the point of the meeting was for Wear to obtain a gun and he took the Ruger when he fled.

We cannot ignore this substantial evidence of a plan to steal a gun notwithstanding the strong evidence supporting a different conclusion. We agree with Wear that plenty of evidence suggested that he intended to buy a gun from Rossknecht, including the evidence that he came to the meeting unarmed and quickly disposed of the Ruger after taking it. But it is the factfinder, "not the appellate court[,] that must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357–358.) Even if it is *more* reasonable to believe the shootings resulted from a gun deal gone wrong, not a calculated robbery, we cannot agree with Wear that "the conclusion that 'hit a lick' meant a robbery does not 'reasonably and logically flow from the preliminary facts.' "

Wear also argues that it is significant that he took the Ruger, not the Smith and Wesson that Rossknecht apparently planned to sell, because "the evidence does not support an inference that Wear even knew about the presence of the Ruger, let alone that he intended to steal it before or during the use of force." Even assuming that Wear was unaware of the Ruger until it fell to the ground during the struggle, "[w]e know of no requirement that a robber's intent to steal must be directed towards items he [or she] has identified at the time he [or she] applies the force, as opposed to items he [or she] identifies during the same transaction. A defendant commits only one robbery no matter how many items he [or she] steals from a single victim pursuant to a single plan or intent. We see no rationale for limiting the scope of the robbery only to the specific items on which the defendant has focused at the time he [or she] initially applies the force." (*People v. Brito* (1991) 232 Cal.App.3d 316, 325–326, fn. omitted; see *People v. Ortega*

17

(1998) 19 Cal.4th 686, 699–700.)  So long as Wear intended to steal *something* from Rossknecht at the time he shot him, it does not matter that Wear ended up stealing an item he did not initially know Rossknecht had.

In short, substantial evidence supports the conviction for first degree murder on a felony-murder theory.

     *C.*     *There Is Insufficient Evidence of Premeditation and Deliberation.*

We reach a different conclusion as to the evidence of first degree murder on a theory of premeditated murder.  In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our state Supreme Court addressed the use of circumstantial evidence to prove premeditated murder.  (See *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1265 (*Boatman*).)  *Anderson* "developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation."  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419–420.)  *Anderson* observed that the evidence typically found sufficient to support such findings " 'falls into three basic categories: (1) facts about how and what [the] defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; [and] (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' "  (*People v. Thomas* (1992) 2 Cal.4th 489, 516–517 (*Thomas*).)

*Anderson* observed that " '[a]nalysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and

18

otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing].' " (*People v. Halvorsen*, *supra*, 42 Cal.4th at p. 420.) The Supreme Court has emphasized, however, that *Anderson*'s "guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight." (*Ibid.*; see *Thomas*, *supra*, 2 Cal.4th at p. 517 [*Anderson* "did not refashion the elements of first degree murder or alter the substantive law of murder in any way"].)

Wear argues that "[t]here was no evidence of planning activity, the most important prong of the *Anderson* test." He observes that there was no evidence he arrived at the scene with a weapon and that the meeting with Rossknecht "was set up on a Sunday afternoon in a suburban neighborhood in plain view of multiple witnesses, all but ensuring the killing would be observed and quickly discovered." Wear also points to the fact that "the men were loudly arguing before the shootings, suggesting [he] acted rashly in response to provocation rather than a preconceived plan," as well as to his emotional distress afterward, suggesting he regretted what happened.

In response, the Attorney General lists several circumstances that he contends provided sufficient evidence of planning activity. But three of these circumstances, while supporting a finding that Wear planned to obtain a gun from Rossknecht, do not, in and of themselves, support a reasonable inference that Wear planned to *kill* Rossknecht. These circumstances are that Wear agreed to meet Rossknecht, "ostensibly to buy his silver Smith and Wesson revolver"; that Wear met Rossknecht at McDonald's, near Xavier C.'s home, where Rossknecht stored his firearms; and that the two went to Xavier C.'s home together to retrieve the revolver and were standing near each other "during a loud argument shortly before the shooting commenced."

These circumstances are relevant to prove premeditated and deliberate murder only if they are considered in conjunction with the last circumstance the Attorney General identifies. That circumstance is the following text message Wear sent to his girlfriend, which the prosecution contended referred to Rossknecht: "I gnna have thatvbigga in hedward killed tay is aready stalkin,him,waiting,til I saybsnoke en." This

19

message cannot reasonably be construed as evidence that Wear planned to kill Rossknecht when considered in its context, which was obscured during the trial.

There was no dispute during the trial that "tay" referred to Taylor O., whose contact information was listed under that nickname in Wear's phone. But interpreting the text message as stating a plan to kill Rossknecht with Taylor O.'s help is wildly speculative and borders on the absurd. Under such an interpretation, Wear was having Taylor O. stalk Rossknecht and wait for orders to kill him. She flatly denied that Wear "[h]ad . . . ever asked [her] to follow or keep tabs on . . . Rossknecht," however, and she was good friends with Rossknecht and had no apparent motive to kill him. In any case, no other evidence was presented to support this supposed plan, which bore no relationship to the circumstances under which Rossknecht was actually killed.

Furthermore, the context of the text message was obscured from the jury, even though this context is critical for its interpretation. Wear sent the message to his girlfriend in the midst of an ongoing fight about their relationship. From about 4:30 a.m. to 5:30 a.m. on the morning of the shootings, Wear and his girlfriend exchanged several texts on this topic. Many of Wear's were complete gibberish, leading his girlfriend to accuse him of being "burnt right now" and tell him the way he was "acting on there dam pills" was making her "crazy."

Several hours later, around noon, Wear and his girlfriend resumed their fight. After Wear's girlfriend noticed that Wear had changed his status to "single" on Facebook, she blocked him on her account, at which point he threatened to kick her out if she did not unblock him. The following exchange then occurred (messages sent by Wear in bold):

| SENDER | TIME | TEXT |
| --- | --- | --- |
| Girlfriend | 1:37 p.m. | I'll start acting right as long as you do to cause the shit you do back to me is ten times worse and hurts me so much it makes me want to stop loving you and that's hard cause i got so much love for you. Your my everything thing |
| Girlfriend | 1:40 p.m. | Okay james |
| Wear | 1:47 p.m. | **I dont have fCd vikn abtnddbcdibt** |

20

| Girlfriend | 1:51 p.m. | Wait wat?  James did you take more pills |
|---|---|---|
| Wear | 1:52 p.m. | **Naw I don't,have to see ur flirt wit ut ex** |
| Girlfriend | 1:52 p.m. | Wat are you talkin about james . |
| Girlfriend | 1:53 p.m. | Wat the fuck are we doing are we gonna work at this or no |
| Girlfriend | 1:53 p.m. | Cause your confussin me and just playin wit me |
| Girlfriend | 1:53 p.m. | I'm tryin to work it out wit you but wat are you tryin to do |
| Wear | 1:56 p.m. | **I gnna have thatvbigga in hedward killed tay is aready stalkin,him,waiting,til I saybsnoke en** |
| Girlfriend | 1:57 p.m. | Wtf are you even talkin about james |
| Girlfriend | 1:59 p.m. | You know your loosing it james |
| Girlfriend | 2:00 p.m. | Wont be able to add you til tonight most likely |
| Girlfriend | 2:01 p.m. | I already Unblocked u |
| Girlfriend | 2:01 p.m. | Now stop tryin to fight wit me please |
| Wear | 2:01 p.m. | **YOU ARE GETTING ALL THE NIHGAS OFF YOUR FB OR I SWEAR ILL,THROW URBSHIT OUT** |
| Girlfriend | 2:01 p.m. | Are we gonna try and work at this or wat babe |
| Girlfriend | 2:02 p.m. | Then you doin the same wit females |
| Girlfriend | 2:03 p.m. | And you are not ever talk to that fat bitch again james |

This full exchange shows that Wear sent the text message at issue in the middle of an argument with his girlfriend about their relationship.  The message was sent right *after* he texted a message to her to the effect that his being blocked from her Facebook account meant that he would no longer have to see her flirt with her ex.  And it was sent right *before* he texted a message demanding his girlfriend block other men's access to her Facebook account.  It makes no sense that, in the middle of this dispute, Wear would suddenly announce a plan to have Rossknecht stalked and killed by Taylor O.  To the

21

extent the object of the message can be discerned, it is far more naturally interpreted as referring to the girlfriend's ex or some other romantic threat, not Rossknecht.[11]

The context of the message was obscured during the trial. The exhibit from which the above-quoted conversation between Wear and his girlfriend was drawn, People's Exhibit 25B, was part of a report containing the actual data extracted from Wear's cell phone, and it was admitted into evidence. But the prosecutor used the report only in questioning a police officer about the technical aspects of extracting the cell phone data, and the record does not reflect that it was published to the jury.

Instead, the primary exhibit the prosecutor used in presenting the phone records, People's Exhibit 71, was a master timeline combining the records for Wear's, Lowell's, and Rossknecht's phones. The prosecutor used this exhibit to question Inspector Galindo, who was the main witness to offer interpretations of various terms in the messages. During this portion of the questioning, which takes up approximately 20 pages of the reporter's transcript, the prosecutor displayed Exhibit 71 with a projector so the jury could "follow along" as he asked Inspector Galindo about specific messages and phone calls.

But Exhibit 71 is an incomplete summary of the phone records, as it excludes many of the text messages between Wear and his girlfriend, instead including only those messages the prosecutor deemed relevant. Thus, the exhibit represents the content of the texts between Wear and his girlfriend during the relevant time as follows (boldface omitted and brackets in original, except where they indicate the deletion of Wear's girlfriend's name):

| SENDER | TIME | TEXT |
|--------|------|------|
| Wear | 11:41 a.m. – 3:28 p.m. | [114 texts back and forth with [Wear's girlfriend]] |

[11] Nor does it appear that Wear accidentally sent the text message to his girlfriend instead of another recipient. He was not actively texting with anyone else at the time; he had sent a text message to Lowell about two hours earlier asking whether Lowell was working that day, but Lowell did not respond until after Wear sent the message at issue.

| Wear | 11:46 a.m. | "An my xanax gone" |
|------|------------|--------------------|
| Wear | 1:56 p.m. | "I gnna have thatvbigga in hedward killed tay is aready stalkin,him,waiting,til I saybsnoke en" [I'm gonna have that nigga in Hayward killed. Tay is already stalking him, waiting till I say smoke 'em] |
| Girlfriend | 1:57 p.m. | "Wtf are you even talkin about james" |
| Girlfriend | 1:59 p.m. | "You know you are loosing it james" |
| Wear | 2:37 p.m. | "Have good lifr" |

By removing the context of the message at issue—i.e., its placement in the midst of the argument between Wear and his girlfriend about Facebook and romantic rivals—the exhibit artificially furthered an interpretation that the message might refer to Rossknecht.

Finally, we address another potentially relevant circumstance, which is Nicholas P.'s testimony that Wear had threatened to kill Rossknecht months before the shootings. According to Nicholas P., Rossknecht and Wear "had some sort of disagreement, . . . something petty." When asked whether Wear had said anything about his feelings toward Rossknecht, Nicholas P. responded, "He didn't care for him. I mean, they were both making statements about each other when I would see them because they knew that . . . I was friends with both of them. So when I would see one, they would tell me their side of the story and the other one would tell me their side of the story." Specifically, Nicholas P. testified that Wear said "something along the lines about [Rossknecht] always trying to act hard and . . . [that] he was a youngster and needed to be put in his place." In addition, both Wear and Rossknecht had separately told Nicholas P. that they "want[ed] to kill" the other, though Nicholas P. did not believe "either one of them were seriously talking about killing each other."[12]

The parties address this evidence as it bears on motive, and we agree that threats to kill are circumstantial evidence that a person has a motive to kill someone. But threats do

_____

[12] This testimony was somewhat contradicted by that of Inspector Galindo, who interviewed Nicholas P. shortly before trial and took notes on the interview, which was not recorded, soon after the interview ended. According to the inspector, Nicholas P. said that Wear said "[Rossknecht] deserved it, always trying to act all hard," during their call after the shootings, not that Wear said at some earlier point that Rossknecht deserved to be put in his place. The inspector also testified that Nicholas P. told him Wear specifically "said he'd shoot [Rossknecht]," not just "kill" him.

not in and of themselves suggest what that motive *is*, and they are more directly relevant to whether a person has a *plan* to kill. This distinction is illustrated by *People v. Martinez* (1987) 193 Cal.App.3d 364 (*Martinez*), in which the defendant made numerous threats to harm or kill his girlfriend if she cheated on him. (*Id.* at pp. 370–371.) Characterizing the defendant's threats to kill his girlfriend as "evidence of planning," *Martinez* concluded that the jury could have inferred that the defendant had "killed her in conformity with [a] preconceived plan" to do so after he found her with another man. (*Id.* at p. 371.) In contrast, the decision characterized "[t]he facts about [the defendant's] prior relationship with [his girlfriend] and the circumstances under which he killed her" as "evidence from which a jury could infer that [he] had a motive to kill her," namely jealousy. (*Id.* at pp. 371–372.)

We accept that there was some evidence of motive here. It was essentially undisputed that Wear and Rossknecht knew each other and had some sort of falling out that may have been unresolved at the time of the shootings. In addition, as discussed above, Nicholas P. testified that the two men had threatened to kill each other, and there was evidence that Wear said afterward that Rossknecht deserved to be shot. Although Nicholas P.'s testimony hardly compelled the conclusion that Wear actually wished to kill Rossknecht, viewed in the light most favorable to the prosecution's case it established Wear's motive to do so. (See *People v. Rivera* (2019) 7 Cal.5th 306, 325 [evidence of "past contentious encounters" between defendant and victim and defendant's comments about victim "provided evidence of a prior relationship and conduct from which the jury could have inferred a motive to kill" victim].)

As evidence of planning activity, however, Wear's statement to Nicholas P. that he wanted to kill Rossknecht falls short, and it stands in stark contrast to the specific threats in *Martinez*. Wear's threat occurred well before the shootings and evinced no particular plan to follow through.[13] The expression of an intent to kill must be considered

---

[13] We recognize that Inspector Galindo testified that Nicholas P. said Wear expressed an intent to "shoot" Rossknecht, which aligns more specifically with what actually happened. But neither Wear nor Lowell brought a gun to the meeting, and it is a

in context, and the fact that a defendant at one time wished to kill the victim, without more, does not permit a reasonable inference that the defendant's eventual killing of the victim was deliberate and premeditated. For example, if a defendant made a genuine threat to kill the victim because of a business dispute, but then the victim ambushed the defendant in a dark alley and the defendant shot the victim, it would be unreasonable to infer that the killing was premeditated based on the previous threat. Where, as here, there is no other evidence of planning activity, a previous threat does not constitute substantial evidence of premeditation and deliberation unless it tends to suggest that the killing was based on "preexisting reflection," as opposed to "unconsidered or rash impulse." (*People v. Solomon*, *supra*, 49 Cal.4th at p. 813.)

Finally, as to the manner of killing, the Attorney General contends there was "overwhelming evidence to support that factor" because the evidence showed that Wear shot Rossknecht twice in the face from close range, at least once after Rossknecht was already lying on the ground.[14] According to the Attorney General, this demonstrated "an execution-style killing [done] while Rossknecht was incapable of resisting," of a type numerous decisions have found sufficient to support a verdict of premeditated murder.

"When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*Thomas*, *supra*, 2 Cal.4th at p. 516.) In any case, even if evidence of premeditation in the "manner of killing is strong, cases in which findings of premeditation and deliberation are upheld typically involve planning and motive evidence as well." (*Boatman*, *supra*,

_____

stretch to infer a plan to use Rossknecht's own gun to kill him based on a general threat to shoot him made at some unspecified earlier time.

[14] Elsewhere in his brief, the Attorney General states that the evidence showed "Rossknecht was on the ground when he was shot at close range in the forehead and then directly into his right ear." Although the blood spatter found on Lowell's car's passenger door strongly suggested Rossknecht was already on the ground for at least one of the shots, the Attorney General does not explain how the blood spatter tended to show that both shots occurred after Rossknecht was on the ground. Indeed, given that Rossknecht was found lying facedown with his right ear exposed, it seems more likely that he was shot in the forehead *before* he went to the ground.

25

221 Cal.App.4th at p. 1268 [discussing cases].) The decisions the Attorney General cites are easily distinguishable on this basis, as they also involved significant other evidence of premeditation and deliberation. (E.g., *People v. Salazar* (2016) 63 Cal.4th 214, 245 [gang member cocked gun when approached by victim, whom he believed to be member of rival gang, and shot victim nine times]; *Lee*, *supra*, 51 Cal.4th at p. 637 [defendant threatened to "straighten . . . out" victim who refused to have sex with him before restraining her and shooting her seven times in head]; *People v. Horning* (2004) 34 Cal.4th 871, 902 [defendant brought gun to scene and bound and blindfolded victim before shooting him in head].) Here, in contrast, there is a remarkable lack of evidence of planning activity or a pre-existing intent to kill and relatively weak evidence of motive.

Moreover, many of the decisions the Attorney General cites emphasized the evidence that the murder was carried out in a deliberate manner against an unresisting victim—i.e., an "execution-style" murder—and/or the lack of evidence suggesting that the murder was the product of " 'mere unconsidered or rash impulse hastily executed.' " (*People v. Wright*, *supra*, 39 Cal.3d at p. 593; e.g., *Lee*, *supra*, 51 Cal.4th at p. 637 ["manner of killing was calm and exacting, supporting a conclusion that it was the result of preexisting thought and reflection rather than an unconsidered rash impulse"]; *People v. Horning*, *supra*, 34 Cal.4th at pp. 902–903 [bullet to head of unresisting victim demonstrated "a calculated design to ensure death rather than an unconsidered explosion of violence"]; *People v. Hawkins* (1995) 10 Cal.4th 920, 956 ["little if any evidence of struggle . . . that might lend support to the hypothesis that the murder occurred on impulse or in a rage"]; *People v. Bloyd* (1987) 43 Cal.3d 333, 348 [no evidence of struggle before shooting of kneeling victim].) Here, there was strong evidence that Wear *did* kill Rossknecht impulsively, shooting Rossknecht with Rossknecht's own gun only after Rossknecht shot Lowell in the course of an argument.

In our view, the only aspect of the manner of killing that arguably supports a finding of premeditation and deliberation is the point-blank shot to Rossknecht's ear, which was the second inflicted against Rossknecht. We do not question that this shot

26

provides substantial evidence that Wear *intentionally* killed Rossknecht.  (See *People v. Smith* (2005) 37 Cal.4th 733, 742 ["the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice"].)  But "[i]t is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation.  'If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations.' "  (*Anderson*, *supra*, 70 Cal.2d at pp. 24–25; see *People v. Banks* (2014) 59 Cal.4th 1113, 1153 [premeditation and deliberation require " 'substantially more reflection than may be involved in the mere formation of a specific intent to kill' "].)  Here, with one exception, the eyewitnesses testified that the third shot immediately followed the second, leaving no span of time in which Wear could have premeditated and deliberated Rossknecht's death.  And while the remaining witness described a pause between the second and third shots that was "longer" than the "little pause" between the first and second shots, in light of the evidence as a whole it is simply speculative to conclude that Wear formed the requisite intent in any such interval.

The Attorney General also suggests that Wear's actions after the shootings reinforce the conclusion that Wear acted with premeditation and deliberation, as Wear "fled with Rossknecht's possessions . . . and attempted to dispose of evidence and evade capture."  To be sure, Wear took the Ruger with him when he left the scene, disposed of it (albeit in a place where it was quickly discovered), and attempted to avoid arrest.  While such evidence may tend to show guilt (see § 1127c), we are not aware of any authority "supporting the proposition that defendants tend to flee [or dispose of evidence] only when they have committed certain crimes but not others."  (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1148.)  In particular, we do not see how these haphazard actions support the conclusion that Wear committed premeditated and deliberate murder as opposed to second degree murder or any lesser homicide offense.  Similarly, although we recognize there was evidence that Wear told Nicholas P. after the shootings that

27

Rossknecht deserved what he got, any lack of remorse about Rossknecht's death does not suggest the killing was premeditated and deliberate as opposed to merely intentional. In sum, the lack of evidence of planning, weak evidence of motive, and absence of any other evidence suggesting premeditation and deliberation, combined with the strong evidence that Wear impulsively shot Rossknecht after Rossknecht shot Lowell, leads us to conclude that insufficient evidence supports a verdict of premeditated murder. As a result, the conviction cannot stand.

We conclude by noting that neither party asks us to exercise our authority under section 1260 to reduce Wear's conviction to second degree murder, and we decline to do so. (See *People v. Westerfield* (2019) 6 Cal.5th 632, 717 [leaving open question whether second degree murder is lesser included offense of first degree felony murder].) Though it is undisputed that the prosecution cannot retry Wear for first degree murder on a premeditation theory, we express no opinion on what other limits there may be on retrying him for Rossknecht's homicide.

III.
DISPOSITION

The judgment is reversed.

_____

Humes, P.J.

WE CONCUR:


_____

Margulies, J.


_____

Banke, J.


*People v. Wear*  A152732

29

Trial Court:

> Superior Court of the County of Alameda

Trial Judge:

> Hon. Leopoldo E. Dorado

Counsel for Defendant and Appellant:

> Lauren E. Dodge, under appointment by the Court of Appeal

Counsel for Plaintiff and Respondent:

> Xavier Becerra, Attorney General
>
> Jeffrey M. Laurence, Senior Assistant Attorney General
>
> Donna M. Provenzano, Supervising Deputy Attorney General
>
> Christina Vom Saal, Deputy Attorney General

*People v. Wear*  A152732